MUCH SHELIST, P.C.
Garrett Prybylo (SBN 304994)
gprybylo@muchlaw.com
660 Newport Center Drive, Suite 900
Newport Beach, CA 92660
Tel:    (949) 767-2200

BRANCART & BRANCART
Christopher Brancart (SBN 128475)
cbrancart@brancart.com
P.O. Box 686
Pescadero, CA 94060
Tel:    (650) 8790141
Fax:   (650) 879-1103

Attorneys for Plaintiff The Ohio House LLC

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **THE OHIO HOUSE LLC,** | No.  8:19-cv-01710-JVS-GJS |
| **Plaintiff,** | **PLAINTIFF'S MOTION AND MEMORANDUM IN SUPPORT OF MOTION TO COMPEL FURTHER ANSWERS TO PLAINTIFF'S INTERROGATORY NOS. 26 AND 27** |
| **vs.** | |
| **CITY OF COSTA MESA,** | |
| **Defendant.** | |
| **CITY OF COSTA MESA, etc.,** | |
| **Counter-Plaintiff,** | |
| **vs.** | |
| **THE OHIO HOUSE  LLC, etc., et al.,** | |
| **Counter-Defendants.** | |

### MOTION TO COMPEL

Pursuant to the Rule 37 of the Federal Rules of Civil Procedure, as modified by this Court's order (ECF 68, 77), plaintiff The Ohio House LLC hereby moves

1   the Honorable Gail J. Standish, United States Magistrate Judge for the Central

2   District of California, for issuance of an order compelling defendant City of Costa

3   Mesa to provide further answers to plaintiff's interrogatories 26 and 27.

4        This motion follows the Court's pre-discovery motion telephone conference

5   re the parties' December 17, 2020 email and its order granting plaintiff leave to

6   file it. (ECF 68, 72.)  It also follows the subsequent conference amongst counsel,

7   as directed by the Court, conducted on December 29, 2020, to discuss narrowing

8   this discovery dispute.   That conference was unsuccessful.  (Brancart Dec., filed

9   herewith, ¶ 2, Exh. 1.)

10        This motion is based on the following memoradum.

1

**TABLE OF CONTENTS**

2    I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

3    II.    CLAIMS, DEFENSES, AND ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . 6

4        A.    The Atomony and Purpose of Interrogatories 26 and 27 . . . . . . . . . 7

5        B.    Procedural and Factual Background Relevant to Motion . . . . . . . . . 9

6        C.    Plaintiff's Claims and the Relevance and Proportionality

7            of the Discovery at Issue. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

8        D.    The Nexus between Claims and Discovery . . . . . . . . . . . . . . . . . . . . 14

9        E.    The City's Shifting Defenses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

10    II.    Plaintiffs Needs A Complete Answer to Interrogatory 26

11        to Know the Issues to be Litigated. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

12    III.    The City's Objections to interrogatory 27 are Misplaced. . . . . . . . . . . . . 20

13    IV.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# MEMORANDUM IN SUPPORT OF MOTION

By this motion, plaintiff Ohio House LLC (Ohio House or plaintiff) seeks to compel defendant City of Costa Mesa (City) to provide complete answers to interrogatories 26 and 27.

Plaintiff's original interrogatories 26 and 27 (Brancart Dec., Exh. 2) – and the City's objections and answers thereto (Brancart Dec., Exh. 3) – read, in full:

### *Justification: Governmental Interests*

**[Plaintiff's interrogatory] 26:**  For each specific governmental interest of the City[1] advanced by Ordinances 15-11, 15-13, 17-05, and 17-06, please identify [a] the nature and objective of each specific interest identified, [b] the factual basis for the belief that each specific interest identified was actually advanced by Ordinances 15-11, 15-13, 17-05, or 17-06, [c] the specific provision(s)[2] of Ordinances 15-11, 15-13, 17-05, or 17-06 that the City credits with advancing each specific interest identified, and [d] any other City regulation or legislation[3] that the City believes also advances each specific interest identified.

---

[1]**Interrogatory 26, fn 1 reads:**  "As used in these interrogatories, "governmental interest" includes any 'legitimate, nondiscriminatory interests of the City' (ECF 51, p. 3), any of 'the City's legitimate governmental interests' (ECF 51, p. 5), the City's "legitimate, non-discriminatory reasons" (ECF 48, p. 53), the "City's enumerated reasons for the Ordinances [15-11, 15-13, 17-05, or 17-06]" (City Interrogatory 13), and the City's "legitimate governmental interests" (ibid)."

[2]**Interrogatory 26, fn 2 reads**: "Please provide citations to the specific provisions of each ordinance or its codification in the Costa Mesa Municipal Code, whichever is more convenient for the City."

[3]**Interrogatory 26, fn 3 reads**: "As used in these interrogatories, " any other City regulation or legislation" means any other regulation promulgated by the City or legislation enacted by the City other than Ordinances 14-13, 15-11, 15-13, 17-05, or 17-06."

1    **[City's response] 26:**   The City objects that the Interrogatory is
2    oppressively burdensome and overbroad. The City objects that the
3    Interrogatory seeks information that is not relevant and not reasonably
4    calculated to lead to the discovery of admissible evidence, and is not
5    proportional to the subject matter of this case. The City objects that the
6    Interrogatory is vague and unintelligible. The City objects that the
7    Interrogatory incorrectly presumes an ability to attribute causation of the
8    functioning of society to particular provisions in laws. The City objects that
9    this Interrogatory exceeds the stipulated number of Interrogatories allowed
10    in this action. Subject to and without waiving the foregoing objections, the
11    City responds as follows:
12        The City enacted non-discriminatory zoning provisions to serve
13    legitimate governmental interests including to maintain the residential
14    character of the neighborhoods, to promote safety and the well-being of the
15    City's citizens, to prevent institutionalization, and to reduce overcrowding,
16    inordinate amounts of second-hand smoke, noise, traffic, and parking.
17
18        All of the City's laws work together to promote these and/or a
19    combination of these and other legitimate governmental interests. Where the
20    City's laws are being followed, these legitimate governmental interests are
21    promoted. Where the City's laws are not being followed, these legitimate
22    governmental interests are not promoted, evidenced in part by increased
23    complaints from citizens where the laws are not being followed.
24
25    **[Plaintiff's interrogatory] 27**:   If the City considered any alternatives to
26    the provisions of Ordinances 15-11, 15-13, 17-05, or 17-06 to advance the
27    specific governmental interests identified in answer to interrogatory 26, then
28    for each specific interest [a] identify and describe each alternative

considered by the City, [b] who proposed and who considered the alternative, [c] each reason why the alternative was rejected, and [d] the material facts supporting each reason for rejection of that alternative.

**[City's response] 27:**  The City objects that the Interrogatory is oppressively burdensome and overbroad. The City objects that the Interrogatory seeks information that is not relevant and not reasonably calculated to lead to the discovery of admissible evidence, and is not proportional to the subject matter of this case. The City objects that the Interrogatory seeks information protected by the attorney-client privilege, work-product doctrine, legislative privilege and deliberative process privilege. The City objects that the Interrogatory is vague and unintelligible. The City objects that the Interrogatory incorrectly presumes a "strict scrutiny" and "least restrictive means test" applies in this action, which is not the applicable law, and the City does not need to prove that it employed "least restrictive means" to promote legitimate governmental interests. The City objects that this Interrogatory exceeds the stipulated number of Interrogatories allowed in this action.

Pursuant to the Court's instructions, the parties conferred further on December 29, 2020.  Plaintiff proposed in writing to narrow interrogatory 26 to the interests specified by the City in response 26 (a proposal superceded in light of the City's amended answer (ECF 72)) and amplified the basis and need for a complete answer to interrogatory 27.  (Brancart Dec., Exh. 1.)  At the December 29 conference, the City rejected plaintiff's modification of interrogatory 26 and its explanation for interrogatory 27.   This motion followed.  (ECF 68, 72.)

## II.  CLAIMS, DEFENSES, AND ALLEGATIONS

Since 2013, the City has enacted zoning regulations that restrict the location and operation of group homes for disabled persons in Costa Mesa's residential

zoning districts. (ECF 45 [operative complaint].)  The City applied and enforced those regulations against Ohio House's group home on Wilson Street in Costa Mesa. (Id.) Plaintiff claims that the City's zoning regulation of group homes discriminates against housing for disabled persons, including Ohio House, in violation of the Fair Housing Act, Fair Employment and Housing Act, and State Planning and Zoning Law.  (Id.)  The City denies those claims and asserts that its zoning regulation of group homes serves legitimate, nondiscriminatory, governmental interests.  (ECF 48, 72.)

### A.   The Atomony and Purpose of Interrogatories 26 and 27

Interrogatory 26 seeks to determine the City's justification for its group home regulations.  The City has placed its justification -- promotion of legitimate, nondiscriminatory, governmental interests -- at the center of this action.  To ensure the relevance and proportionality of interrogatory 26, plaintiff defined and explained its terms in footnotes.  To start, footnote 1 defines "governmental interest" by reference to use of that term -- or similar terms -- in several documents authored by the City.  For example, in the Joint Rule 26(f) Report (ECF 51), the City included in its list of legal issues, "Whether Plaintiff can prove . . .  that the City's legitimate **governmental interests** do not preclude the Claims." (ECF 51, p. 5 [emphasis added].)   In the City's original (ECF 48) and amended (ECF 72) answer, the City asserts that the "City at all relevant times properly exercised its zoning powers for **legitimate, non-discriminatory reasons**."  (ECF 48, p. 53; ECF 72, p. 54 [emphasis added].)  Footnote 2 clarifies interrogatory 26, asking the City to link each interest to specific regulatory requirements advancing that interest, a prerequisite for plaintiff's ability to test the validity and credibility of the City's assertions.  Footnote 3 defines the term "any other City regulation or legislation" to distinguish those regulations from the group home regulations at the center of this litigation.

Interrogatory 27 grew out of two legal requirements that will inform the

1  outcome of this action.   First, under plaintiff's disparate impact theory, the City's

2  consideration and rejection of alternatives are elements of the City's defense to

3  that theory, 2 CCR § 12062(b)(4) ("there is no feasible **alternative** practice that

4  would equally or better accomplish the identified purpose with a less

5  discriminatory effect" [emphasis added).  The validity of this defense is not

6  hypothetical.  The City has twice moved to dismiss this theory (ECF 16, 33),

7  which District Judge Selna has now rejected.  (Order, ECF 42, pp. 10-11 ["the

8  Court finds that Ohio House has pled a sufficient claim under disparate impact"].)

9  Second, under plaintiff's disparate treatment theory, the City's consideration and

10  rejection of alternatives to the challenged regulations are admissible evidence

11  under  the circumstantial proof methodology.  *Pac. Shores Properties, LLC v. City*

12  *of Newport Beach*, 730 F.3d 1142, 1158–59 (2013)("a court analyzes whether the

13  defendant's actions [in that case, a similar group home zoning ordinance enacted

14  by Costa Mesa's neighbor, Newport Beach] were motivated by a discriminatory

15  purpose by examining . . . (2) [t]he historical background of the decision, (3) [t]he

16  specific sequence of events leading up to the challenged decision, (4) the

17  defendant's departures from its normal procedures or substantive conclusions, and

18  (5) relevant legislative or administrative history" [citing Arlington Heights v.

19  Metropolitan Housing Dev. Corp., 429 U.S. 252 (1977)(Proof of zoning

20  discrimination under disparate treatment theory.)   Without an answer to

21  interrogatory 27, plaintiff cannot evaluate the sequence of events – relevant

22  legislative history – leading up to the City's enactment of the challenged

23  regulations – or whether the City's enactment of those regulations departed from it

24  normal substantive conclusions (e.g., that regulations generally applicable to all

25  dwellings regardless of disability status were adequate).

26      **B.   Procedural and Factual Background Relevant to Motion**

27

28

This action is one of six cases[4] related and assigned to Judge Selna.  Each case challenged the legality of the City's zoning regulation of group homes for disabled persons.  Except for the case at bar, Judge Selna has granted summary judgment, entered judgment, and awarded attorneys' fees in favor of the City in each case.

As reflected in the third amended complaint (ECF 45), the zoning regulations applied to Ohio House and challenge in this action were enacted by the City over the course of four years between 2013 and 2017 and summarized as follows:

•  **Ordinance 13-05** amended the Zoning Code by narrowing the definition of "Single Housekeeping Unit," CMMC § 13-06, to exclude group homes from its coverage.  (Single Housekeeping Units are permitted in all residential districts in the City.  (CMMC 13-30; ECF 45, ¶¶ 17-18.)

•  **Ordinance 14-13** amended the Zoning Code by amending and adding definitions, CMMC 13-06, adding a new Chapter XV barring group homes from the City's R-1 (Single family) districts unless permitted, and amending the procedural and substantive criteria governing reasonable accommodations, CMMC 13-200.60 et seq.  (ECF 45, ¶¶ 19-22.)  As relevant here, Ordinance 14-13 further narrowed the definition of "Single Housekeeping Unit," adding criteria intended to exclude group homes from its coverage.  (CMMC 13-06.)  It also amended the definition of "boardinghouse" to read:

> a "residence or dwelling, other than a hotel, wherein rooms are rented under
> three or more separate written or oral rental agreements, leases or subleases

---

[4]SACV 18-1080, National Therapeutic Services, Inc. v. City of Costa Mesa, SACV 18-1369, Summit Coastal Living, Inc. v. City of Costa Mesa, SACV 18-329, Casa Capri Recovery, Inc. v. City of Costa Mesa, and 18-1170, Pacific Shores, LLC v. City of Costa Mesa, SACV 18-1304, SoCal Recovery, LLC v. City of Costa Mesa.

1   or combination thereof, whether or not the owner, agent or rental manager

2   resides within the residence. Boardinghouse, small means two or fewer

3   rooms being rented. Boardinghouse, large means three or more rooms being

4   rented.  CMMC 13-06.

It added a definition for "group home" to read:

> a supportive living environment for persons who are considered
> handicapped under state or federal law. A group home operated by a single
> operator or service provider (whether licensed or unlicensed) constitutes a
> single facility, whether the facility occupies one (1) or more dwelling units.
> Group homes shall not include the following: (1) residential care facilities;
> (2) any group home that operates as a single housekeeping unit.  CMMC 13-
> 06.

The amended reasaonble accommodation provisions precluded any
accommodation to group homes unless each of seven findings could be made in
favor of the group home.  (CMMC 13-200.60 et seq.)

•      **Ordinances 15-11 and 15-13** were campanion ordinances that
amended the City's zoning code and occupation licensing title in order to regulate
group homes in the City's multifamily (apartments) zoning districts.  (ECF 45, ¶¶
24-35.)  Ordinance 15-11 amended the zoning code.   It rewrote the definition of
"boardinghouse" to new read:

> A residence or dwelling, other than a hotel, wherein rooms are rented under
> two (2) or more separate written or oral rental agreements, leases or
> subleases or combination thereof, whether or not the owner, agent or rental
> manager resides within the residence. Boardinghouse, small means two (2)
> or fewer rooms being rented. Boardinghouse, large means three (3) to six
> (6) rooms being rented. Boardinghouses renting more than six (6) rooms are
> prohibited.

It add a new Chapter XVI barring existing and any future group homes from
multifamily districts unless the group home obtained a special use permit (for
unlicensed homes with six or fewer residents) or a conditional use permit (for

-10-

1   unlicensed homes with seven or more residents).  CMMC 13-320 et seq.   For

2   Ohio House to obtain a conditional use permit under Chapter XVI, it was required

3   to meet the City's generally applicable CUP criteria and two additional standards,

4   a separation and a licensing requirement.

5   　　　The first condition, under new Chapter XVI, subjected only two residential

6   uses to separation requirements, group homes and boardinghouses.  But their

7   separation requirements impose very different criteria.  (ECF 45, ¶¶ 29-32.)  On

8   the one hand, an existing group home must be 650 feet from any other group

9   homes or state licensed home or treatment or recovery facility to qualify for a

10   CUP.   (CMMC 13-30, fn 5-7; ECF 45, ¶¶ 29-32.)  On the other hand, an existing

11   boardinghouse – of which there are none – are grandfathered as nonconforming

12   uses; a new small boardinghouse must be "650 feet from from any other **small**

13   **boardinghouse**. Large boardinghouses [must be]  1000 feet away from **any other**

14   **boardinghouse**."  (Id. [emphasis added].)

15   　　　The second condition added under new Chapter XVI, required a group

16   home -- but not a boardinghouse -- to obtain an operator's permit, which is also a

17   condition for obtaining a CUP under Ordinance 15-11. (CMMC 13-323.)

18   Ordinance 15-13 added new Article 23, Chapter II, Title 9 of the City Code,

19   mandating that group homes housing more than seven disabled persons obtain an

20   operator's permit.  CMMC Title 9, Art. 23.

21   　　　•　　**Ordinances 17-05 and 17-06** were campanion ordinances.

22   Ordinance 17-05 amended Chapter XV, imposing new restrictions on group homes

23   in R-1 districts, amended Chapter XVI, toughening the separation requirements

24   between group homes, and amended CMMC 13-200.60 et seq., dropping one

25   requirement from the City's reasonable accommodation criteria. (ECF 45, ¶¶ 33-

26   35.)  Ordinance 17-06 amended the requirements to obtain a group home

27   operator's permit under the Title 9 (business regulation), a prerequisite for a CUP,

28   adding more than a dozen new restrictions and requirements.  (*Id.;* ECF 45, ¶ 70.)

1    As alleged in the third amended complaint, Ohio House commenced

2    operating a group home know as the Wilson Street property before Ordinance 15-

3    11 was enacted.  (ECF 45, ¶¶ 44-49.)  Following passage of the Ordinance 15-11,

4    Ohio House applied for a reasonable accommodation asking that the Wilson Street

5    property to be treated as a nonconforming use or to relax the 650-foot separation

6    requirement, which the City denied.  (ECF 65, ¶¶ 50-54.)   It also applied for a

7    CUP, which the Planning Commission and then the City Council denied.  (ECF

8    65, ¶¶ 55-63.)

9    After the City rejected plaintiff's applications, the City directed plaintiff to

10   "cease operation of the subject group home by September 8, 2019" or face civil

11   citations and abatement for operating a group home with a permit.  (ECF 45, ¶ 41;

12   OH 851.)   It issued several citations against the Wilson Street property "for

13   operation of a sober living/group home facilities, without City approval."  (ECF

14   45, ¶ 41; OH 837.)  It then sued Ohio House in state court seeking to abate the

15   Wilson Street house, claiming that it is a public nuisance based on the allegation

16   that Ohio House is "continuing to operate a sober living home [Wilson Street

17   Property] in violation of [the City's] zoning codes."   (ECF 65, ¶ 69.)

18       **C.    Plaintiff's Claims and the Relevance and Proportionality of the**

19       **Discovery at Issue.**

20   The third amended complaint (ECF 45) alleges that since 2013 defendant

21   City of Costa Mesa has engaged in a pattern or practice of zoning discrimination

22   on the basis of disability[5].  (ECF 45, ¶¶ 17-37.)  It claims that the City has

23

24   _____

25       [5]The Fair Housing Act uses the term "handicapped."  The Act uses the term
     "handicap" instead of the term "disability." Both terms have the same legal

26   meaning. See Bragdon v. Abbott, 524 U.S. 624, 631 (1998) (noting that definition
     of "disability" in the Americans with Disabilities Act is drawn almost verbatim

27   "from the definition of 'handicap' contained in the Fair Housing Amendments Act

28   of 1988"). This motion uses the term "disability," which is more generally

committed five, specific "discriminatory housing practices," 42 U.S.C. § 3602(b), in violation of the Fair Housing Act (FHA), 42 U.S.C. §§ 3603(a), 3613 (ECF 45, ¶¶ 71-233) and Fair and Employment and Housing Act (FEHA)[6], Govt. Code § 12955.6, the FHA's state law counterparts (ECF 45, ¶¶ 234-399):

•   42 U.S.C. § 3604(c) making it unlawful for the City to "make, print, or publish, or cause to be made, printed, or published any notice, [or] statement, . . . with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on . . . handicap . . . or an intention to make any such preference, limitation, or discrimination."

•   42 U.S.C. § 3604(f)(1) making it unlawful for the City to "otherwise make unavailable or deny, a dwelling to any . . . renter because of a handicap of— (A) that renter, (B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or (C) any person associated with that buyer or renter."

•   42 U.S.C. § 3604(f)(2) making it unlawful for the City "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of— (A) that person; or (B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or (C) any person associated with that person."

•   42 U.S.C. § 3604(f)(3(B) making it unlawful for the City to "refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person [with disabilities]

---

accepted.

[6]The third amended complaint also alleges that the City violated the State Planning and Zoning Law, Govt. Code § 65008.  A violation of that statute is treated as separate, actionable violation of FEHA, 2 CCR § 12005(z)(2), but for equitable relief only.

equal opportunity to use and enjoy a dwelling;" and,

• 42 U.S.C. § 3617 making it unlawful for the City to "coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title, [the FHA]."

Taken as a whole, the third amended complaint claims that the City's pattern or practice of zoning discrimination violates the FHA by "enacting or implementing land-use rules, ordinances, procedures, building codes, permitting rules, policies, or requirements that restrict or deny housing opportunities or otherwise make unavailable or deny dwellings to persons because of . . . disability." 24 C.F.R. § 100.70(d)(5).

**D.     The Nexus between Claims and Discovery**

Plaintiff seeks to prove its claims pursuant to several discrimination theories that demonstrate the need for this discovery.   Under the disparate treatment theory, plaintiff seeks to establish that the City violated §§ 3604(f)(1) and 3604(f)(2) by each of three methods.   First, that the City injured plaintiff pursuant to the City's pattern or practice of discrimination.   *See, e.g., Havens Realty Corp. v. Coleman*, 455 U.S. 363, 381 n.23 (1982)(pattern or practice claim by private plaintiffs); *International Broth. of Teamsters v. U.S.*, 431 U.S. 324, 336 (1977)(City's discrimination is "more than the mere occurrence of isolated or accidental or sporadic discriminatory acts; [instead], it was the City's "standard operating  procedure – the regular rather than the unusual practice.")  Second, direct proof, that the City injured plaintiff pursuant to the overtly discriminatory provisions in the challenged zoning regulation that the City applied to plaintiff. Bangerter v. Orem City Corp., 46 F.3d 1491, 1501, n.16 (10th Cir. 1995)("There is no need to probe for a potentially discriminatory motive circumstantially, . . . as the [City's zoning regulation] discriminates on its face by allowing conditions to

1    be imposed on group housing for the handicapped which would not be permitted

2    for non-handicapped group housing."); *Community House, Inc. v. City of Boise*,

3    490 F.3d 1041, 1050. (9th Cir. 2007)(same).  Third, circumstantial proof, that the

4    City injured plaintiff pursuant to the challenged zoning regulations that were

5    adopted to advance a discriminatory purpose or objective.  *Pac. Shores Properties,*

6    *LLC v. City of Newport Beach*, 730 F.3d 1142, 1158–59 (2013).

7         Plaintiff also seeks to establish that the City violated §§ 3604(f)(1) and

8    3604(f)(2) under the disparate impact theory under either the FHA or FEHA.  Ave.

9    6E Investments, LLC v. City of Yuma, Ariz., 818 F.3d 493, 509-513 (9th Cir.

10   2016)(developer states disparate impact claim based on city's denial of rezoning

11   application); see also Texas Dep't of Hous. & Cmty. Affairs v. Inclusive

12   Communities Project, Inc.,135 S. Ct. 2507, 2522 (2015)(identifying disparate

13   impact challenges to specific applications of municipal zoning powers);  Cal.

14   Govt. Code § 12955.7(b)("Proof of a violation causing a discriminatoryeffect is

15   shown if an act . . . has the effect, regardless of intent, of unlawfully

16   discriminating.")

17        Under the discriminatory statement theory, plaintiff seeks to show that the

18   City violated § 3604(c).  24 C.F.R. § 100.202(c)("It shall be unlawful to make an

19   inquiry to determine whether . . . a person intending to reside in that dwelling after

20   it is so sold, rented or made available, or any person associated with that person,

21   has a [disability] or to make inquiry as to the nature or severity of a [disability] of

22   such a person."  Montana Fair Hous., Inc. v. City of Bozeman, 854 F. Supp. 2d

23   832, 839 (D. Mont. 2012)("Because the Court has determined that the Authorized

24   Uses Section [in Bozeman's zoning code] is facially discriminatory, it necessarily

25   follows that the section violates 42 U.S.C. § 3604(c)"); Gibson v. Cty. of

26   Riverside, 181 F. Supp. 2d 1057, 1084 (C.D. Cal. 2002)(county zoning ordinance

27   limiting occupancy of dwellings based on age violates § 3604(c).)

28        Under the reasonable accommodation theory, plaintiff seeks to establish that

the City violation § 3604(f)(3)(B).  United States v. California Mobile Home Park, 107 F.3d 1374, 1382 n. 3 (9th Cir. 1997)("The vast majority of reported cases brought under § 3604(f)(3) involve developers' requests for variances of zoning ordinances that would allow them to build [here, continue occupancy of] housing for handicapped persons. . . . In these cases, causation poses no independent hurdle for the plaintiffs. The city policies directly interfere with use and enjoyment because they prevent the housing from being [occupied as a group home of disabled persons or] built.")

For the plaintiff, the biggest hurdle in this action is not adducing evidence to establish its prima facie case; instead, its biggest challenge is fixing the City's defenses -- its legitimate, nondiscriminatory interests advanced by the challenged regulations -- and ascertaining the basis for its contention that the challenged regulation advance those interests as opposed to a discriminatory objective.

**E.    The City's Shifting Defenses.**

A key objective of interrogatories 26 and 27 is to establish the City's nondiscriminatory justification for its zoning regulations.   If plaintiff cannot ascertain those defense and their basis, then plaintiff cannot refute them by demonstrating that the City's justifications are a pretext for disparate treatment or insufficient to justify the disparate impact caused the challenged regulations.   In other words, plaintiff will lose this case if it cannot fix the City's defenses and the basis for those defenses.

This challenge is especially dire in this case.   The City's defenses have shifted over time.  The City won its first motion to dismiss (ECF 16) by convincing Judge Selna that the City treats group homes better than boardinghouses.  Relying on the City's misstatements about the explicit terms of its regulations, Judge Selna dismissed the first amended complaint, ruling:

Group Homes are permitted to be closer than boardinghouses (650 feet versus 1,000 feet), and Group Homes are permitted to have residents of

1  seven or more with a CUP, whereas boardinghouses have a strict limit of six
2  residents. While Group Homes, but not boarding houses are required to
3  obtain an Operator's Permit (CMMC 9-372, 13-323(c)), this requirement
4  only comes in effect when Group Homes have seven or more residents,
5  whereas boarding houses are completely banned from ever having seven or
6  more residents. Thus, the Multi Family Ordinances are a benefit to the
7  protected class.  (Order, p. 9, ECF 28.)

8  After plaintiffs' second amended complaint highlighted that the City's defense
9  was based on a misstatement of the explicit text of its regulation, Judge Selna
10 reversed course:

11   Although there are some benefits to Group Homes over boardinghouses in
12   that they are permitted to be closer than boardinghouses (650 feet versus
13   1,000 feet), Group Homes are limited to having only six residents (or seven
14   or more residents if they obtain a CUP), but boardinghouses have no
15   resident limit. Ordinance 15-11. Instead, boardinghouses are classified by
16   the number of rooms they have. CMMC 13-6. Therefore, the Court cannot
17   say without making factual determinations whether boardinghouses are
18   similarly situated and whether Group Homes are treated more favorably.
19   (Order, p. 8 [ECF 42].)

20 After plaintiff's third amended complaint highlighted that, by its express terms,
21 the regulations imposed a separation requirement on group homes that was more
22 burdensome than that imposed on boardinghouses (ECF 45, ¶¶ 29-32), the City
23 changed its entire defense theory.   Although contrary to the express text of the
24 City's regulation, the City posited out of thin air that boardinghouses and group
25 house are not separate uses at all, the latter treated better than the former.  (This
26 has been the City's core defense since at least 2017:  It can't be liable for
27 discrimination under any theory because it treats group homes better than
28 boardinghouses.)   But in the wake of the third amended complaint explicating the

City's regulations, the City has completely reinvented its defenses.

First, the City now conflates the two uses, asserting out of thin air that a group home could elect to be treated as boardinghouses if it wanted, a wholly new theory disclosed for the first time on October 26, 2020, in the City's interrogatory answers:

> The City's group home regulations can only be beneficial because they are an exception to the boardinghouse regulations, and if the group home regulations were not beneficial, then an applicant could simply ignore them and apply as a regular boardinghouse.  (Brancart Dec., Exh. 3, p. 18.)
>
> * * *
>
> The City's current boardinghouse definition is being amended to conform to legislative intent, including that at all relevant times, it was the City's intent and practice, as applicable, that boardinghouses also be limited to the number of residents, including up to three for small boardinghouses and six for large boardinghouses.   (Brancart Dec., Exh. 3, p. 21.)
>
> * * *
>
> [W]hile boardinghouses that do not qualify as a group home are restricted to three residents for small boardinghouses and six residents for large boardinghouses.  (Brancart Dec., Exh. 3, p. 21.) (This statement is confused because it assert a contention the City abandons in other answers.)
>
> * * *
>
> Boardinghouses that can qualify as group homes can locate in the R1 zone with a permit, are not strictly limited to the number of rooms that can be rented or the number of tenants that can be housed, and are required to separate by 650 feet (as compared to 1,000 feet for large boardinghouses) and only as to other boardinghouses that qualify as group homes or state licensed drug and alcohol treatment facilities. (Brancart Dec., Exh. 3, p. 22.)

The last assertion is troubling, hinting at yet another defense twist:  That in spite

of the express language of City's regulation, the City will take the position that all group homes are now boardinghouses and that all boardinghouses are now group homes; thus, the separation requirement between boardinghouses is more onerous because it is measured from the boardinghouse and any other boardinghouse *or* group home.  Could this be a new defense – and if so, what possible legitimate interest is advance by rendering the express terms of the City's regulation so unintelligible?

Second, after the rewiring the City's defenses in its interrogatory answers, the City shifted the entire focus of its defense in its amended answer, filed on January 11, 2021.  (ECF 71.)   The City now raises an entirely new set of defenses.  In addition to alleging counterclaims, the City's amended answer now asserts:

> The TAC [third amended complaint] and each alleged claim for relief
> contained therein are barred, in part or in full, because Ohio House's
> business and operations including but not limited to providing care and
> supervision, holding themselves out as providing care and supervision,
> accepting clients that demonstrate the need for care and supervision, and/or
> holding themselves out as licensed without the necessary license, are barred
> by State Law, including but not limited to the Health & Safety Code §
> 1503.5, rendering Ohio House's business illegal and unable to state the
> claims or obtain the requested relief in the TAC. (ECF 72, p. 54-55.)

This newly asserted governmental interest also appears in the City's amended Unclean Hand defense (ECF 72, pp. 55-66), which copies more than 30 excerpts from the statutory texts of several California state code chapters and articles, each containing dozens of separate state penal and regulatory provisions.

If plaintiff cannot fix the actual, nondiscriminatory interests that the City asserts are advanced by its regulations -- and basis for that contention -- then plaintiff will lose this case, ambushed by a whole new defense theory at trial. These regulations are now five years old.  The City has successfully defended

every challenge to them.   After five years and uniform victories, it is not unreasonable for plaintiff to ask the City to state its legitimate, nondiscriminatory interests and explain how its regulations advance that interest and not discrimination.

## II.   Plaintiffs Needs A Complete Answer to Interrogatory 26 to Know the Issues to be Litigated.

Interrogatory 26 seeks information solely in the City's control:  The interests the City sought to advance at the time it enacted its zoning regulations of group homes.   Plaintiff alleges that the City's true objective was "[e]nacting or implementing land-use rules, ordinances, procedures, permitting rules, policies, or requirements that restrict or deny housing opportunities or otherwise make unavailable or deny dwellings to persons because of . . . handicap," a violation of the FHA and FEHA.  24 C.F.R. § 100.70(d)(5).   The City claims that it had other objectives in mind.  Interrogatory 26 seeks to enumerate those nondiscriminatory interests and the basis for the City's contention that its zoning regulations promoted those interests.  This request is neither premature nor unfair.  The City has successfully defended these regulations in several cases over several years.  Without this disclosure, plaintiff cannot focus its discovery to test the City's contention nor prepare to rebut the City's assertions at trial.

## III.   The City's Objections to interrogatory 27 are Misplaced.

The City interposes boilerplate objections to this interrogatory.  It broadly asserts privileges to block discovery that is directly relevant to the claims (plaintiff's disparate treatment theory) and defenses (no feasible alternative under disparate impact theory) that must be determined in this action.  Moreover, the City fails to provide any reasons to believe there is a basis for invoking these privileges.  Even if there were, plaintiff contends that the City reads these privileges too broadly in the context of this case, that the needs of this case trump these privilege, and if the City is allowed to block this discovery, then it should be

1   precluded from presenting related arguments or evidence at trial or in a motion.

2   First, the City reads the legislative privilege too boardly.   This interrogatory

3   does not ask for a legislator to testify about her individual mental processes;

4   instead, it asks whether the City considered and rejected alternatives to the

5   regulations challenged in this action, information that can be supplied without

6   offending the legislative privilege.

7   Second, the City is the sole source of this information.   If the City refuses

8   to provide this information, then it should be precluded from contesting plaintiff's

9   presentation of alternatives to show that the City's true objective was

10   discriminatory.  It should also be precluded from justifying its regulation under the

11   disparate impact claim by arguing or offering evidence that there is no feasible

12   alternative to the regulations it enacted and enforced.

13   Third, the deliberative process privilege does not shield this information

14   from discovery.   The deliberative process privilege yields "when government

15   misconduct is the focus of the lawsuit." *Tri-State Hosp. Supply Corp. v. United*

16   *States*, 226 F.R.D. 118, 134-35 (D.D.C. 2005); *Artfield Builders v. Village of*

17   *Buffalo Grove*, 1992 U.S. Dist. LEXIS 16328, No. 92 C 0284, 1992 WL 314185,

18   at *2 (N.D. Ill. 1992)(noting that the deliberative process privilege can be

19   overcome in Fair Housing Act litigation). The dominant view is that the exception

20   is simply a restatement of the principle that the deliberative process privilege does

21   not apply when the government's intent is at issue. See, e.g., TriState Hospital, 226

22   F.R.D. at134-35 ("Under the government misconduct exception, there is no need

23   to engage in a balancing test because the privilege does not apply at all.");

24   *Alexander v. Federal Bureau of Investigation*, 186 F.R.D. 154, 163-65 (D.D.C.

25   1999) (rejecting the government's contention that misconduct merely is a factor);

26   *In re Sealed Case*, 121 F.3d at 746 ("Moreover, the privilege disappears altogether

27   when there is any reason to believe government misconduct occurred."). If a party

28   can produce "some evidence," including circumstantial evidence, that the

government had improper motivations, the government misconduct exception allows the party to conduct discovery on the question of intent. Alexander, 186 F.R.D. at 165. *United States v. Lake County Bd. of Comm'rs*, 233 F.R.D. 523, 527 (N.D. Ind. 2005)

This analysis has been applied to deny the invocation of the these process privileges in the Fair Housing context as it applies to zoning decisions and its decision makers especially when discriminatory intent is a central issue to claims or housing discrimination. *United States v. Lake County Bd. of Comm'rs, supra*; *Stewart B. McKinney Foundation, Inc. v. Town Plan and Zoning Commission of the Town of Fairfield*, 790 F.Supp. 1197, 1212-13 (D. Conn. 1992)(finding that "the Commission's interpretation of the Regulations was unreasonable and, therefore, the Commission's stated reasons for its decision were pretextual"). Two Circuit Courts of Appeals have recognized that decision makers' thoughts and unrecorded deliberations are appropriate forms of discoverable evidence in cases such in matters of housing discrimination in the zoning context. *See Regional Economic Community Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 49-53 (2nd Cir. 2002) (recounting the thoughts and mental impressions of Planning Board members, as well as deposition testimony regarding the members' thoughts leading to decision at issue in a case brought under the Fair Housing Act, Americans with Disabilities Act, and Rehabilitation Act); *Smith & Lee Associates, Inc. v. City of Taylor, Michigan*, 13 F.3d 920,928-29 (6th Cir. 1993) (considering deposition testimony regarding the reasons City Council members did not vote to rezone the land in question in this Fair Housing Act case).

Last, how the attorney-client privilege is implicated is unclear based on the City's answer.  The City's blanket assertion of that privilege is insufficient to justify a complete failure to answer this interrogatory.

///

1

## IV.  CONCLUSION

2       For all of the foregoing reasons, plaintiff requests that the Court issue an

3  order directing the City of Costa Mesa to provide further, complete, responses to

4  plaintiff's interrogatory numbers 26 and 27.

5       Dated:  January 14, 2021.

6                          Respectfully submitted,

7

8  BRANCART & BRANCART                    MUCH SHELIST, P.C.
                                          Garrett Prybylo (SBN 304994)
9  */s/ Christopher Brancart*             gprybylo@muchlaw.com
   Christopher Brancart (SBN 128475)      660 Newport Center Drive, Suite 900
10 cbrancart@brancart.com                 Newport Beach, CA 92660
   P.O. Box 686                           Tel:   (949) 767-2200
11 Pescadero, CA 94060
   Tel:   (650) 8790141
12 Fax:   (650) 879-1103

13            Attorneys for Plaintiff The Ohio House LLC

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

Pursuant to Rule 5 of the Federal Rules of Civil Procedure, on January 14, 2021, I served by email via ECF a copy of the attached document – **PLAINTIFF'S MOTION AND MEMORANDUM IN SUPPORT OF MOTION TO COMPEL FURTHER ANSWERS TO PLAINTIFF'S INTERROGATORY NOS. 26 AND 27** – on the following attorneys:

Samantha E. Dorey
Seymour B Everett, III
Christopher D. Lee
Everett Dorey LLP
18300 Von Karman Avenue Suite 900
Irvine, CA 92612
Fax: 949-377-3110
sdorey@everettdorey.com
severett@everettdorey.com
clee@everettdorey.com

Kimberly Hall Barlow
Bruce Lindsay
Monica Choi-Arredondo
Jones Mayer
3777 North Harbor Boulevard
Fullerton, California 92835
Fax (714) 446-1448
khb@jones-mayer.com
bal@jones-mayer.com
mca@jones-mayer.com

*/s/ Christopher Brancart*

-24-