BRANCART & BRANCART
  Christopher Brancart (SBN 128475)
  cbrancart@brancart.com
  Elizabeth Brancart (SBN 122092)
  ebrancart@brancart.com
P.O. Box 686
Pescadero, CA 94060
Tel:   (650) 879-0141
Fax:   (650) 879-1103

Attorneys for Plaintiff The Ohio House LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **THE OHIO HOUSE LLC,** | No.  **8:19-cv-01710-JVS-GJS** |
| **Plaintiff,** | **PLAINTIFF THE OHIO HOUSE LLC'S REPLY IN SUPPORT OF ENTRY OF JUDGMENT ON ITS GOVERNMENT CODE § 65008 CLAIM** |
| **vs.** | |
| **CITY OF COSTA MESA,** | Hearing: Date:        July 11, 2022 Time:        3:00 p.m. Courtroom: JVS |
| **Defendant.** | |

//
//
//
//
//
//
//
//
//

1

2

**TABLE OF CONTENTS**

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    Entry of judgment in favor of Ohio House under § 65008 does not contravene the Seventh Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.    As a matter of law, Ohio House established that the City violated Government Code § 65008. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        *1. The plain text of the City's group home regulations applied to Ohio House established that they were facially discriminatory as a matter of law.* . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        *2. The City's admissions establish that the City's sought to close Ohio House "because of" the disability of its residents.* . . . . 10

    C.    Ohio House's § 65008 claim is not time-barred. . . . . . . . . . . . . . . . 12

    D.    Ohio House's § 65008 claim for injunctive relief is not moot. . . . . . 15

    E.    *Salerno* does not bar Ohio House's claims. . . . . . . . . . . . . . . . . . . . 17

    F.    The burden of proving that the facial discrimination was justified fell to the City which, as a matter of law, failed to meet its burden of proof. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        *1. The City's "benefit" analysis has already been rejected by the Court.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        *2. Plaintiff's expert did not admit that the City's regulations "benefitted" persons with disabilities in their housing opportunities.* . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        *3. The City's claim of "benefit" fails as a matter of law.* . . . . . . . . 19

III. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

-ii-

1

**TABLE OF AUTHORITIES**

2

*CASES*

3

*Baltimore & O. S. W. R. Co. v. Burtch,* 263 U.S. 540 (1924) . . . . . . . . . . . . . . . . 4

4

*Brillhart v. Philips Elec. N. Am. Corp.,* 938 F. Supp. 742 (D.N.M. 1996) . . . . . . . 3

5

6

*City of Los Angeles, Dep't of Water & Power v. Manhart,*
      435 U.S. 702 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

7

8

*Cnty. of Sonoma v. Superior Ct.,* 190 Cal. App. 4th 1312 (2010) . . . . . . . . . . . . . 13

9

*Forest Conservation Council v. Rosboro Lumber Co.,*
      50 F.3d 781 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

10

*Gibson v. Cnty. of Riverside,* 132 F.3d 1311 (1997) . . . . . . . . . . . . . . . . . . . . . . . . 2

11

12

*High Sierra Hikers Ass'n v. Powell,* 150 F. Supp. 2d 1023 (N.D. Cal. 2001) . . . 16

13

*Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v.
      Johnson Controls, Inc.,* 499 U.S. 187 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . 8

14

15

*Latta v. Otter*, 771 F.3d 456 (9th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

16

*Liberty Mut. Fire Ins. Co. v. Woolman,* 913 F.3d 977 (10th Cir. 2019) . . . . . . . . . 3

17

*Lujan v. Minagar,* 124 Cal. App. 4th 1040 (2004) . . . . . . . . . . . . . . . . . . . . . . . 3-4

18

*Parklane Hosiery Co. v. Shore,* 439 U.S. 322 (1979) . . . . . . . . . . . . . . . . . . . . . . . 3

19

*In re Peterson,* 253 U.S. 300 (1920) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

20

*S. Oregon Barter Fair v. Jackson Cnty.* 372 F.3d 1128 (9th Cir. 2004) . . . . . . . . 16

21

*Sjolund v. Musland,* 847 F.2d 1573 (Fed. Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . 3

22

*United States v. Salerno*, 481 U.S. 739 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

23

24

*U.S. for Use & Benefit of Evergreen Pipeline Const. Co. v. Merritt Meridian
      Const. Corp.,* 95 F.3d 153 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

25

*Urb. Habitat Program v. City of Pleasanton,* 164 Cal. App. 4th 1561 (2008) . . . 13

26

*Yellowstone Women's First Step House, Inc. v. City of Costa Mesa,*

27

      2019 WL 6998664 (C.D. Cal. July 16, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . 13

28

*STATUTES*

Fair Housing Act, 42 U.S.C. § 3615 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Cal. Govt. Code § 12955.6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Cal. Govt. Code § 36900(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Cal. Govt. Code § 65008 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

# I. INTRODUCTION

The City enacted zoning and permitting regulations explicitly prohibiting existing group or sober living homes from operating in residential districts unless the home, retroactively, met certain application and permitting conditions.  The City subjected Ohio House's Wilson Property to those regulations because it provides "a supportive living environment for persons who are considered handicapped under state or federal law."  The City "administered" its regulations as written.  By operation of the regulatory text, the City "discriminate[d] against [the Wilson Property, a] residential development . . . because of [the disability of its] intended occupants." Cal. Govt. Code § 65008(b)(1).  Pursuant to that same text, the City took "action" that "denies [Ohio House and its Wilson Property residents] the enjoyment of residence, land ownership, tenancy, or any other land use because of [disability]." Cal. Govt. Code § 65008(a)(1).  The City cited and fined (and sued[1]) to force the Wilson Property to cease operating as "a supportive living environment for persons who are considered handicapped under state or federal law" because it lacks "City approval" in accordance with regulations that discriminate on their face. (ECF 446, Proposed Findings of Fact, Etc. ["Fact"] 99.)

As a matter of law, the City's actions to administer or enforce its facially discriminatory regulations which, by operation of their explicit, unambiguous terms, now compel the closure of the Wilson Property, violate subsections (a) and (b) of Government Code § 65008.  The City's actions and administration applied textual requirements to the Wilson Property that, on their face, operated to discriminate.

---

[1]The Court granted the City's limine motion barring Ohio House from introducing evidence that the City had sued to abate the Wilson Property because it was unable to meet the separation requirement to obtain a group home permit. (ECF 347 at 13.)  Ohio House complied with that order; the City, however, solicited testimony at trial from its witnesses that the City had sued group home to secure their closure following adoption of the group home regulations.  (ECF 442 at 894:12-14 [Le].)

Whether that legal text and the subsequent administration in accordance with that text is discriminatory is a question of law for this Court to answer.  That question's answer resolves this motion since on its face § 65008 bars municipal actions or administration that denies land use rights or discriminates on the basis of disability. *Gibson v. Cnty. of Riverside*, 132 F.3d 1311, 1313 (1997) (§ 65008 "is clear on its face and requires no assistance from any other source in interpreting its meaning"). The jury's verdict is contrary to the uncontroverted evidence and therefore is not insulated by the Seventh Amendment.

While the basis for this motion may be broad, the relief sought is narrow. The relief sought arises directly from the City's administration of its discriminatory regulations, specifically the issuance of citations and fines and their enforcement requiring the Wilson Property to cease providing "a supportive living environment for persons who are considered handicapped under state or federal law." This motion asks only that the City be enjoined from taking action that would force the closure of the Wilson Property pursuant to its administration of the City's group home regulations.  That same relief would also relieve Ohio House from its obligation to pay fines or defend the pending abatement action.   Whether the regulations themselves should, as a matter of law, be declared invalid for "requir[ing] or permit[ting] any action that would be a discriminatory housing practice under [the Fair Housing Act, 42 U.S.C. § 3615, or the Fair Employment and Housing Act, Cal. Govt. Code § 12955.6] is not presently before the Court.

## II.  ARGUMENT

**A.  Entry of judgment in favor of Ohio House under § 65008 does not contravene the Seventh Amendment.**

The City argues that the Court must enter judgment in its favor under § 65008 because the jury made explicit and implicit factual findings in its favor.  Namely, the City claims that the jury found that

the City did not intentionally discriminate, did not facially discriminate

-2-

1   and/or was justified, did not interfere with Ohio House and thus did not
2   deny Ohio House's clients enjoyment of any land use or take negative
3   action against Ohio House, and did not make discriminatory statements.
4   The findings further include that disability was not a motivating factor
5   in any of the City's conduct. Finally, the findings include that Ohio
6   House was not injured by the City.

7   (ECF 450 ["Opp."] at 13-14.)

8        But the Seventh Amendment is not implicated where the facts are not disputed
9   and those facts entitle a party to judgment. *See Parklane Hosiery Co. v. Shore*, 439
10  U.S. 322, 336 (1979) (neither directed verdict nor summary judgment procedures
11  violate the Seventh Amendment).  That is because "[n]o ne is entitled in a civil case
12  to trial by jury unless and except so far as there are issues of fact to be determined."
13  *In re Peterson*, 253 U.S. 300, 310 (1920).  For that reason, cases decided in the
14  context of summary judgment or other rulings as a matter of law are analogous
15  authority for deciding whether the Seventh Amendment mandates that the Court
16  accept the jury's explicit or implicit factual findings. (See ECF 448 ["Brief"] at 9-10;
17  Opp. at 14-15.)  And *Liberty Mut. Fire Ins. Co. v. Woolman*, 913 F.3d 977, 993 (10th
18  Cir. 2019), cited by Ohio House and ignored by the City, explicitly provides that
19  courts are bound by the jury's findings "only to the extent that fact issues central to
20  a claim are decided by a jury upon evidence that would justify its conclusion."

21       While the Court is bound by the jury's explicit and implicit factual findings,
22  the jury was not free to disregard the City's own admissions in reaching its decision.
23  *See, e.g., Brillhart v. Philips Elec. N. Am. Corp.*, 938 F. Supp. 742, 745 (D.N.M.
24  1996) (testimony by employee's supervisor which constituted direct evidence of
25  discriminatory motive was evidence "that the jury was not a liberty to disbelieve");
26  *Sjolund v. Musland*, 847 F.2d 1573, 1579 (Fed. Cir. 1988) (inventor plaintiff's
27  admission that he previously knew of the inventor defendant's idea was testimony
28  that a reasonable jury could not freely disregard in determining patent dispute); *Lujan*

*v. Minagar*, 124 Cal. App. 4th 1040, 1047 (2004) (supervisor's admission that she fired employee in part to head off an anticipated workplace safety complaint constituted undisputed evidence of supervisor's intent that the trial court was not free to disregard). *See also Baltimore & O. S. W. R. Co. v. Burtch*, 263 U.S. 540, 543 (1924) (if the uncontradicted evidence "affirmatively establishes" that a shipment originated in Kentucky and was carried to Indiana, "it was an interstate shipment, and neither the [jury's] special findings [to the contrary] nor the general verdict will preclude us from so holding"); *U.S. for Use & Benefit of Evergreen Pipeline Const. Co. v. Merritt Meridian Const. Corp.*, 95 F.3d 153, 170 (2d Cir. 1996) (district court "certainly did not err" in setting aside portion of damages award conflicting with the admissions of plaintiff's damages expert).

Although the City claims that a multitude of factual disputes were presented at trial, the City fails to identify any such "disputed facts" – as opposed to characterizations of fact.[2] Nor could it since every fact Ohio House presented at trial concerning the City's course of conduct was based directly on the City's *own* regulatory text, staff reports and other official documents and the testimony of the City's current and former employees who were not only charged during the relevant time period with the responsibility of implementing the group home regulations, but also were the same officials who applied those MFR group regulations to MFR group homes, including the Wilson Property. The evidence discussed below was based entirely on the City's own documents or testimony, was uncontroverted, and no basis exists for concluding, as the City suggests, (Opp. at 16-18), that the jury simply

---

[2]Nor do the City's objections to Ohio House's proposed findings of fact identify any *facts*, as opposed to *characterizations* of the facts, in dispute. (See ECF 449.) Repeatedly stating that facts are irrelevant or cannot be credited because the jury found no discrimination ignores the thrust of Ohio House's here – that the undisputed facts do not support the jury's conclusion, making it appropriate for the Court to determine, based on those undisputed facts, whether Ohio House established a violation of § 65008 as a matter of law.

decided to "discredit" it. That evidence establishes that Ohio House is entitled to judgment under § 65008.

**B.   As a matter of law, Ohio House established that the City violated Government Code § 65008.**

*1. The plain text of the City's group home regulations applied to Ohio House established that they were facially discriminatory as a matter of law.*

The City's actions against Ohio House were based on facially discriminatory regulations, establishing a violation of § 65008.  (Brief at 7-8.)  The City did not claim that the plain text of its regulations was other than what Ohio House established; it only claimed that the plain text did not mean what it said.  The uncontroverted evidence established the following facts based on admissions provided in City documents or testimony:

[1]    That the City adopted Ordinances 14-13, 15-11, and 17-05 regulating group homes in residential zones.[3]

[2]    That the group home regulations defined "group home" and "sober living home" to mean housing occupied by persons considered disabled under the state and federal fair housing laws and no other occupancy.  (Fact 11; CMMC 13-6.)

[3]    That Chapter XVI of the Zoning Code regulated group homes for persons with disabilities in the City's MFR zones.

[4]    That pursuant to the *text* of the group home regulations:

•    Upon enactment, Ordinance 15-11 (codified in Chapter XVI) required existing group homes in the MFR zones with six or fewer residents to obtain a special use permit and group homes with seven or

---

[3]The text of the City's group home regulations was "admitted" and required no proof per the Pretrial Order.  (ECF 324 at 2-4.)  The fact that each ordinance was adopted by the City was stipulated as part of the Pretrial Order, subject to evidentiary objections.  (Id. at 4-7.)

more residents to obtain a conditional use permit and operator's permit to continue operations.  (Fact 27;[4] CMMC 13-324.)

• Group homes and sober living homes were the only existing residential uses subject to the permit requirements imposed by Ordinance 15-11.  (Fact 29; CMMC 13-324.)

• Failure to obtain the permits rendered a group home in violation of the Zoning Code and subject to civil fines, penalties, and enforcement.  (Fact 29.)

• Issuance of the conditional use permit was subject to the condition that the group home "is at least six hundred fifty (650) feet from any . . . group home, sober living home or state-licensed drug and alcohol treatment facility."  (Fact 28; CMMC 13-323.)

• Group homes with seven or more residents in the MFR zones – and no other use in the City – were required to obtain an operator's permit under CMMC 9-370, et seq.  (Facts 28, 32 [City Admission No. 86].[5])

• Group homes were required to obtain a special CUP and operator's permit under Chapter XVI and 9-374 while boardinghouses needing a CUP were subject to the regular permit requirements applicable to *all other* uses.  (Fact 33.)

• Group homes are the only residential use in the Zoning Code

---

[4]In its proposed Finding of Fact 27, Ohio House cited to Nancy Clark's testimony for support.  In Finding of Fact 112, Ohio House supported the same fact by reliance on the pre-2014 Zoning Code showing that residential service facilities with six or fewer persons were permitted uses in all residential zones prior to adoption of Ordinance 14-13.  (Facts 27, 112; Tr. Exh. 835, ECF 443-4 at 161 [2000 Zoning Code Land Use Matrix].)

[5]The Court instructed the jury that it must treat this fact, presented in the form of an admission, "as having been proved."  (ECF 442 at 1164:16-21.)

1   prohibited from operating pursuant to their CUP without a separate
2   operator's permit.  (Fact 33.)

3   •      That operator's permit is non-transferable.  (Fact 33; CMMC 9-
4   375(b).)

5   •      Between May 2017 and September 2018, group homes were the
6   only land use applicants required to give public hearing notice to both
7   owners and *occupants* within 500 feet.  (Fact 35-36.)

8   •      Since May 2017, group homes applicants are the only land use
9   required to provide extensive corporate, ownership, and licensing
10  disclosures as part of their applications to obtain an SUP or CUP.  (Fact
11  37.)

12  •      Between Ordinance 14-13 (October 2014) and Ordinance 21-20
13  (December 2021) the *text* of the definition of the term "boardinghouse"
14  limited the number of rooms rented; it contained no occupancy
15  restriction.  (Fact 85; ECF 443-5 at 8, 42.)

16  •      Between Ordinance 14-13 and Ordinance 21-20, based on the *text*
17  of the boardinghouse definition and land use matrix, so long as a
18  boardinghouse rented only two rooms, it was a permitted use in the
19  MFR zones with *no* occupancy limit (other than the Uniform Housing
20  Code).  (Fact 38, 45, 85; see also ECF 442 at 679:11-25 [Curtis].)

21  •      The group home regulations imposed more requirements and
22  restrictions on sober living homes for persons in recovery than on group
23  homes for persons with any other types of disabilities.  (Fact 46.)

24  [5]   The City applied a more restrictive occupancy restriction to group homes
25  than to boardinghouses which were subject to the state Uniform Housing Act.
26  (Facts 38-45.)

27      As a matter of law, this evidence establishes facial discrimination under the
28  Court's instruction to the jury: "A zoning or land use regulation which, by its terms,

-7-

1   applies different requirements, standards, or procedures to housing defined to be for

2   persons with disabilities than to housing not defined to be for non-disabled persons

3   is facially discriminatory." (ECF 423 at 23, Court's Instruction 18.) That facial

4   discrimination establishes that the regulations (and their enforcement against Ohio

5   House under § 65008) constituted discrimination on the basis of disability unless

6   adequately justified.

7   That conclusion is grounded in the same analysis employed by the Supreme

8   Court almost 50 years ago in *City of Los Angeles, Dep't of Water & Power v.*

9   *Manhart*, 435 U.S. 702, 711, 715-16 (1978). There the Court held that requiring

10  women to make a higher monthly contribution to a retirement plan than men in order

11  to account for their longer life-span constituted facial discrimination, unlawful unless

12  affirmatively justified. The fact that men and women would ultimately receive equal

13  monthly benefits under the pension plan did not render it nondiscriminatory. Nor did

14  a "benefit" granted to women make the policy nondiscriminatory. Women, because

15  they lived longer, actually could receive a greater retirement benefit than men because

16  upon retirement they were likely to receive a longer stream of payments than men.

17  That benefit did not cure the discrimination.

18  Nor can the justifications for a facially discriminatory ordinance or policy be

19  considered when analyzing the text. Whether facial discrimination exists "does not

20  depend on why" a policy discriminates, "but rather on the explicit terms of the

21  discrimination." *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of*

22  *Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991). Following *Johnson*

23  *Controls*, in *Latta v. Otter* the Ninth Circuit rejected the state's argument that its

24  same-sex marriage bans discriminated on the basis of procreative capacity rather than

25  sexual orientation. 771 F.3d 456, 467-68 (9th Cir. 2014). The court found that

26  "while the procreative capacity distinction that defendants seek to draw could in

27  theory represent a justification for the discrimination worked by the laws, it cannot

28  overcome the inescapable conclusion that Idaho and Nevada do discriminate on the

-8-

basis of sexual orientation." *Id.* at 467-68.  In this case, the City's claims that its group home regulations provide a benefit rather than discriminate on the basis of disability are not properly considered in determining facial discrimination, but must be analyzed as a potential justification.  See Part II.F, below.

And even if benefit were properly considered in analyzing the text of the group home regulations for facial discrimination (rather than justification), the City's regulations are still facially discriminatory.  According to the Supreme Court in *Manhart*, the appropriate focus for determining whether discriminatory treatment exists looks to the effect on individuals rather than on fairness to classes.  *Manhart*, 435 U.S. at 709-11.  In other words, although the retirement contribution policy in that case may have benefitted women as *a class*, it did not benefit individual women, each of whom were required to make higher monthly retirement contributions than men.  *Id.*  Here, even accepting the City's claim that its overall zoning scheme benefitted disabled persons seeking to reside in group homes, it most certainly did not benefit residents living in *existing* group homes newly subject to the 650-foot separation requirement.  The City ordered Ohio House to stop providing housing to its existing residents with disabilities as part of the City's implementation of a policy that it claimed was a "benefit" for persons with disabilities as a class.  Like the policy in *Manhart*, the City's group home regulations discriminate on their face and must be adequately justified.

As Ohio House repeatedly argued, the Court, not the jury, must decide whether the regulations are facially discriminatory because that is a question of legal interpretation.  (ECF 280 [MCFL at p. 40]; ECF 324 [Pretrial Order at 33-36; ECF 357 [Objection at 3].)  The reading of a statute to determine its meaning is not a question of fact for the jury.  *Forest Conservation Council v. Rosboro Lumber Co.*, 50 F.3d 781, 783 (9th Cir. 1995) ("The interpretation of a statute is a question of law.").  Thus, the jury in this case could not properly determine the issue of facial discrimination because a facial challenge looks to the terms of the statute, it does not

involve a factual finding.  Either the text of the ordinance facially discriminates or it does not.  If it does facially discriminate, then a jury may be asked to determine factual questions regarding whether that discrimination is justified by benefit or safety (if any disputed questions exist).  But even then the factual questions for the jury are very narrow.  (See ECF 423 at 26-43 [Court's Jury Instructions 20-26].)  Here, the only disputes identified by the City involve the legal issue of the *meaning and interpretation* of the City's Municipal Code provisions regulating group homes.  The historic facts are uncontested.  (See, e.g., City's Objection, ECF 449 at 16, citing to Jennifer Le's testimony interpreting the boardinghouse and group home regulations.[6])  The jury was not free to disregard the plain text of the group home regulations establishing facial discrimination.

### 2. The City's admissions establish that the City's sought to close Ohio House "because of" the disability of its residents.

Not only was the text of the City's group home regulations facially discriminatory, establishing discriminatory intent, the City itself either presented testimony, or failed to dispute evidence, which constituted damning admissions the jury was not at liberty to ignore:

[1]    The City did not deny that in 2016, 2017, 2018, and 2018, the City officially certified to the California Department of Housing And Community

---

[6]For instance, the City argues that Jennifer Le testified that the MFR group home regulations were not "retroactive."  (ECF 449 at 7.)  But the plain text of CMMC 13-324 required only existing group homes, and no others, to obtain a special use permit or conditional use permit and operator's permit or stop operations.  Group homes with six or fewer residents required a special use permit no matter how many rooms they rented.  CMMC 13-322.  No boardinghouse had to obtain a permit *or* comply with a separation requirement imposed retroactively if it rented two or fewer rooms – regardless of occupancy.  (Fact 12, 33, 85, 112.)  In a facial challenge to the text of the regulations, the proper focus is on that text, not the testimony interpreting that text.  Interpretation of the text is an issue of law for the Court.

Development (HCD) that it had taken action to "[p]rotect existing stabilized residential neighborhoods . . . from the encroachment of incompatible or potentially disruptive land uses and/or activities" by adopting the MFR Group Home Ordinance on November 17, 2015 "*to limit the number and concentration of group homes and sober living facilities in the Multiple Family Residential zones*." (Facts 19-20 [emphasis added].)

[2]    The City presented testimony of its primary witness Jennifer Le that the goal of the City's group home regulations was to "spread out the group homes" in the City, (Fact 21(a)), and that the group home regulations helped achieve its goals by "reduc[ing] the clustering and the concentration" of group homes in residential neighborhoods, (Fact 21(b)).

[3]    The City presented testimony of Jennifer Le that, after denying CUPs and reasonable accommodations to applicants seeking permits under the group home regulations (applicable only to housing for persons with disabilities), the City had pursued litigation to shut down approximately ten of those homes in the MFR zones.  (Fact 67.)

[4]    City employee Sheri Vander Dussen testified that staff explicitly advised the City that its Ordinance 17-05 regulations were facially discriminatory, that she twice tried to get the City Council to cure those facially discriminatory provisions, and that the City Council rejected each of her attempts.  (Facts 55-58.)

The jury was not entitled to disbelieve or discredit the City's express statements as to the *purpose* of those regulations – "to limit the number and concentration of group homes and sober living facilities in the Multiple Family Residential zones," and to "spread out the group homes" in the City, nor its admission that it had actually closed down homes pursuant to its regulations.  Ohio House is next for closure given the City's citations and abatement action.  As a matter of law, that conduct is exactly what is forbidden by § 65008's prohibition on any zoning action that, because of

-11-

disability, "denies to any individual or group of individuals the enjoyment of residence, landownership, tenancy, or any other land use in this state" because of disability. As a matter of law, that conduct is exactly what is forbidden by § 65008's prohibition and its ban on administering ordinances so as to "prohibit or discriminate" on the basis of disability. Govt. Code § 65008(a), (b)(1)(B)(ii). That the action was taken on the basis of disability is undeniable given the text of the group home regulations as well as the City's admissions.

As a matter of law, the City's admissions establish that the City "restrict[ed] or attempt[ed] to restrict choices" in connection with the use or enjoyment of a dwelling "so as to discourage or obstructed choices" in a community or neighborhood because of disability. (ECF 423 at 22, Court Instruction 17.) As a matter of law, those admissions establish that the City "limit[ed] housing opportunities in a particular section of a community or neighborhood because of disability." (Id.) And, as a matter of law, the City's imposition of different CUP application and notice requirements on group homes than on boardinghouses or any other land use and applying a more strict occupancy restriction to group homes, establishes that it used "different qualification criteria or applications, or approval procedures or other requirements in land-use rules, ordinances, policies, or procedures because of disability." (Id.) As the Court instructed the jury, those practices violate § 65008. (ECF 442 at 1168:7-23; ECF 423 at 22 [Court's Instruction 17].)

This body of evidence – based entirely on the City's own laws, official documents, and testimony by City witnesses – does not constitute an attempt by Ohio House to "re-write" the facts. (Opp. at 16-17.) And the City is mistaken when it claims that the jury's findings control "regardless" of the evidence. (Opp. at 17.) These undisputed facts establish disability discrimination in violation of § 65008.

**C. Ohio House's § 65008 claim is not time-barred.**

As anticipated, the City contends that the Court is required to conclude that all of Ohio House's claims under § 65008 are barred by § 65009's 90-day statute of

limitations.  (Opp. at 18.)  The specific relief sought here by Ohio House, however, is not subject to § 65009's limitation period, which governs a prescribed list of land use decisions, not the exercise of municipal code enforcement power to cite, fine, and compel the closure of a dwelling.  As stated in *Urb. Habitat Program v. City of Pleasanton*, 164 Cal. App. 4th 1561, 1573 (2008), quoted by the City, "'[t]he goal of section 65009 is to provide 'certainty for property owners and local governments regarding decisions made pursuant to this division.'"  Section 65009 applies to enumerated *decisions* by land use authorities as discussed in *Cnty. of Sonoma v. Superior Ct.*, 190 Cal. App. 4th 1312, 1326 (2010), also cited by the City.  For example, § 65009's limitation period would apply here if this motion asked the Court to invalidate the City group home regulations or compel the City to grant a CUP to the Wilson Property.  It does not.  Instead, it seeks limited, narrow relief arising directly from the City's "administration of ordinances pursuant to any law," Govt. Code § 65008(b)(1), a claim not subject to § 65009's limitations.

Ohio House's claim under § 65008(b) maintains that the City discriminated against it in the administration of its ordinances by utilizing code enforcement citations and fines (and subsequent abatement action) to force closure of the Wilson Property.  This motion does not seek an order invalidating the group home regulations or reversing the denial of Ohio House's applications for a CUP, relief that could be construed as subject to § 65009's limitations.  Instead, it is fixed on the City's "administration of ordinances," which include its use of its code enforcement authority to cite, fine, and abate (close) the Wilson Property.  Neither § 65009 nor § 65008(b) can be read to indicate that administration of "any ordinance" is subject to a statute of limitations applicable to land use decisions only.  Moreover, to conflate "administration" with "decisions" treats the "administration" provision of § 65008(b) as mere surplusage, nullifying § 65008(b)'s unambiguous text while broadening the reach of § 65009 beyond its plain text.  The Court reached a similar conclusion in *Yellowstone Women's First Step House, Inc. v. City of Costa Mesa*, ruling that claims

-13-

arising from municipal code enforcement action are not identified in and therefore not subject to § 65009's 90-day statute of limitations.  No. SACV-14-1852-JVS-JDEx, 2019 WL 6998664, at *8 (C.D. Cal. July 16, 2019).

Thus, even if the Court agrees with the City that Ohio House's claim under § 65008(a) is time-barred under § 65009, the statutory text provides no grounds for reaching the same conclusion as to Ohio House's claim under § 65008(b)(1).  While § 65008(a) by its text applies solely to land use action pursuant to Title 7 of Government Code, the same set of statutory provisions subject to § 65009, § 65008(b) explicitly does not.  *Compare* § 65008(a) (prohibiting discrimination in actions under Govt. Code Title 7, Planning and Land Use) *with* § 65008(b)(1) (prohibiting discrimination in enactment or administration of ordinances "pursuant to any law").  Among the powers conferred on a city that may be embodied in ordinances "pursuant to any law" is the City's code enforcement authority, which flows from Title 4 of the Government Code and the City's own ordinances. Government Code §§ 36900-36901 authorizes cities to prosecute, sue, or fine persons who violate the city's ordinances.  *See* Govt. Code § 36900(a) ("The violation of a city ordinance may be prosecuted by city authorities in the name of the people of the State of California, or redressed by civil action.").  The City's Municipal Code is similar. CMMC 1-36(a) ("Any city code enforcement officer upon determining that a provision of this Code, which he or she is charged to enforce, has been violated has the authority to issue a civil citation to any responsible person or persons.").  The City's code enforcement authority, and actions challenging the exercise of that authority, are not subject to § 65009.

Here, the City administered its ordinances in such a way as to discriminate against Ohio House in violation of § 65008(b)(1).  It violated § 65008(b)(1) by "prohibit[ing] or discriminat[ing] against [the Wilson Property, a] residential development . . . because of the [disability] of . . . the intended occupancy of [that] residential development." *Id.*  To be sure, this code enforcement action discriminates

-14-

1   because of disability. That conclusion is unavoidable based on the text of the specific

2   citations issued against the Wilson Property because it provided "a supportive living

3   environment for persons who are considered handicapped under state or federal law"

4   "without City Approval."  CMMC 13-6, Tr. Exh. 201 [ECF 443-3 at p. 119 of 300];

5   Fact 99.) Evidence of that discriminatory conduct, even if itself not actionable

6   because it is outside the applicable statute of limitations, remains admissible to show

7   that discriminatory intent was at play in the conduct occurring within the statute of

8   limitations.  (Brief at 7-8.)

9          Last, the relief requested in this motion does not undermine the policy

10   behind § 65009 for finality in a limited subset of individual land use decisions.

11   On the one hand, this motion does not require the Court to invalidate the group home

12   regulation or overturn denial of Ohio House's CUP. On the other hand, the gravamen

13   of Ohio House's discrimination claims is not limited to the outcome of one isolated

14   land use decision which could appropriately trigger § 65009's concerns to bring

15   finality to a local land use decision.  Instead, it challenges the City's admitted policy

16   "*to limit the number and concentration of group homes and sober living facilities in*

17   *the Multiple Family Residential zones*." (Facts 19-20 [emphasis added].)  The City

18   pursued that policy by, *inter alia*, citing, fining, and choosing to initiate abatement

19   proceedings against Ohio House, acts which occurred after this suit was filed and are

20   alleged as part of the City's course of conduct in the third amended complaint.

21          **D.  Ohio House's § 65008 claim for injunctive relief is not moot.**

22          The City also claims that the injunction sought by Ohio House is overbroad

23   because it asks the Court to enjoin "'the City from taking any action requiring Ohio

24   House to cease operation.'"  (Opp. at 23 [quoting Brief at 7:14-15].)  That claim is

25   demonstrably false as the portion of the sentence omitted by the City explicitly limits

26   the injunctive relief Ohio House seeks to enforcement of the group home regulations,

27   CMMC Title 13, Chapter XVI and Title 9.  (Brief at 1.)

28          The City also argues that Ohio House's request for injunctive relief is moot

-15-

1   because, even if the group home regulations were found to be discriminatory, Ohio

2   House is operating in violation of the so-called "boardinghouse regulations." (Opp.

3   at 22-23.)  Mootness is a question of law.  *S. Oregon Barter Fair v. Jackson Cnty.*

4   372 F.3d 1128, 1133 (9th Cir. 2004).  The relief sought by Ohio House is not moot

5   for at least two reasons.

6        First, if the Court prohibits the City from enforcing its group home regulations

7   against Ohio House, then the City will no longer be able to collect the more than

8   $23,000 in fines it has assessed against Ohio House nor will it be able to continue

9   pursuing its pending state court abatement action against Ohio House.  Those are real

10  harms that an injunction may alleviate.  The City's citation to *High Sierra Hikers*

11  *Ass'n v. Powell*, 150 F. Supp. 2d 1023, 1036-37 (N.D. Cal. 2001), is inapposite.

12  (Opp. at 23.)  In that case, the plaintiff's claim seeking an injunction to require the

13  Forest Service to implement a management plan was moot because the Forest Service

14  had actually adopted the required plan during the litigation.  Here, the conduct

15  challenged – the City's application of its group home regulations to Ohio House – is

16  ongoing.

17       Second, the City's mootness argument is based upon speculation regarding the

18  outcome of regulatory enforcement not yet initiated by the City.  The City admitted

19  that it had never applied the boardinghouse regulations to any group home, including

20  Ohio House.  (ECF 442 at 899:21-900:10 [Le].)  Thus, no group home subjected to

21  the "boardinghouse regulations" has attempted to challenge those regulations.  Since

22  the City did not apply those regulations to Ohio House, any attempt by it to challenge

23  those regulations in this case would have been dismissed as unripe or for lack of

24  standing.[7]

25

26       [7]For the same reasons, the Court should disregard the City's claim that Ohio
27  House's facial attack fails because it did not show that it would have satisfied the
28  requirements of a "regular" CUP.  (Opp. at 24.)  In fact, the City put Ohio House

(continued...)

1  Finally, the Court should reject the City's repetition of the wholly
2  unsubstantiated accusations that Ohio House is currently engaged in a "myriad of
3  illegal conduct" justifying denial of injunctive relief.  (Opp. at 25 n.8.)  The City
4  never produced any such evidence.  (ECF 347 at 6-7.)  If the City had had evidence
5  that Ohio House had engaged in misconduct in its attempts to obtain a land use permit
6  that could now justify a finding of unclean hands, it could have, but did not, present
7  it to the Court per the Court's limine ruling.  (ECF 347 at 4.)

8  **E.  *Salerno* does not bar Ohio House's claims.**

9  At trial, the Court denied the City's Rule 50 motion concluding that *United*
10 *States v. Salerno*, 481 U.S. 739 (1987), was inapplicable because its rationale is that
11 "a single litigant ought not to invalidate the statute where it provides benefit to others
12 – in other words, coopting people who would clearly benefit.  [¶]  I don't think that
13 that's this case.  I don't think that there are others who would, quote, benefit such that
14 the rationale of *Salerno* makes sense."  (ECF 442 at 1119:4-11.)  Although it
15 acknowledges that the Court previously found that the *Salerno* "no set of
16 circumstances" did not apply in this case, the City repeats its argument to preserve it
17 on appeal.  (Opp. at 25.)  Ohio House's arguments on the issue, set forth in its Brief
18 re Application of *United States v. Salerno* filed at ECF 409, were accepted by the
19 Court and are incorporated herein.  Because every person subject to the City's group
20 home regulations necessarily is, per the statutory definitions, a disabled person, if the
21 regulations are facially discriminatory they will be facially discriminatory in all
22 applications.  The Court should reject the City's renewed *Salerno* argument.

23 **F.  The burden of proving that the facial discrimination was justified fell**
24 **to the City which, as a matter of law, failed to meet its burden of proof.**

25 Once Ohio House established that the City's group home regulations were
26

27 [7](...continued)
28 through that process under the terms of CMMC 13-323(d), and refused to grant
the CUP because of the 650-foot distance separation imposed on group homes.

1  facially discriminatory as a matter of law, the burden shifted to the City to justify that

2  facial discrimination.  It failed to meet that burden as a matter of law.

3         *1.  The City's "benefit" analysis has already been rejected by the Court.*

4         Repeating verbatim the arguments the Court previously rejected when it crafted

5  its jury instructions, the City argues that to assess the benefit of a facially

6  discriminatory zoning provision the zoning code as a whole must be assessed.  (Opp.

7  at 28-21 [repeating argument from ECF 333 at 71-73, 84].)   But the Court's

8  instructions to the jury control the analysis of benefit in this case, and those

9  instructions stated that

10       [w]hile you must consider the justifications for each restriction

11       separately, you should consider the restrictions as a whole.  Regardless

12       of your determination that any single restriction is justified, if you find

13       that (a) one or more of the restrictions is not justified and (b) that the

14       non-justified restrictions restrict the housing opportunities of disabled

15       persons, the City has engaged in facial discrimination.

16  (ECF 442 at 1170:19-1171:1.)  In other words, if one of the restrictions in the group

17  home regulations is not legally justified by the City, the jury was required to find that

18  the City engaged in facial discrimination.

19        *2.  Plaintiff's expert did not admit that the City's regulations "benefitted"*

20        *persons with disabilities in their housing opportunities.*

21        The City cites to various fragments of the testimony of Ohio House's expert

22  Brian Connolly to support its argument that a regulation benefitting disabled persons

23  in their housing opportunities may be valid. (Opp. at 27-29.) But that legal statement

24  is not disputed.  The question is whether the City's regulations actually provide any

25  such benefit.  Nowhere in the snippets of Connolly's testimony cited by the City (or

26  anywhere else) did Connolly testify that the City's regulations benefitted disabled

27  persons in their housing opportunities.  (See ECF 442 at 145:8-146:15, 188:20-25.)

28  And Connolly's opinions regarding the appropriate legal analysis for determining

1  benefit are irrelevant.

2  ### 3.  The City's claim of "benefit" fails as a matter of law.

3  Here the City asserts that the burdens imposed on group homes by the City's

4  group home regulations provide a benefit to the housing opportunities of disabled

5  persons because they allow group homes to locate in residential zones, subject to the

6  conditions imposed by the City.  (Opp. at 29-33.)  But the Court's jury instructions

7  applied to the uncontroverted facts establish, as a matter of law, that the City cannot

8  prove a benefit justifying its facial discrimination. The Court instructed the jury that

9  to determine benefit

10  the City has the burden of proving that the conditions, restrictions, or

11  requirements imposed by each facially discriminatory provision satisfy

12  the following elements:

13  1.  The facially discriminatory provision *actually advances the housing*

14  *opportunities of persons with disabilities*, and

15  2.  Any benefit that facially discriminatory provision provides

16  to disabled persons in their housing opportunities *clearly*

17  *outweighs any burden that the provision places on them*.

18  (ECF 442 a 171:2-24 [emphasis added]; ECF 423 at 28, Court's Instruction 22.)

19  Under California law, the regulation also must be the least restrictive means of

20  achieving the City's identified purpose. (Id.)  There is no "benefit" if the regulations

21  "restrict or deny housing opportunities or otherwise make unavailable or deny

22  housing to persons with disabilities." (Id.)

23  The City argues that it presented "multiple justifications of benefit for all its

24  Group Home Regulations" but fails to identify any that Ohio House neglected to

25  identify in its brief or proposed findings of fact. (Compare ECF 449 at 14-15, Facts

26  76-79 with ECF 446 at 30-33, Facts 74-79.)  And the City claims that its witnesses

27  "explained each aspect of the City's position." (Opp. at 33.)  But City witness

28  testimony contrary to the plain text of the City's group home regulations cannot

discharge the City's burden of proof of benefit.  And the City fails to explain how the group home regulations "benefitted" Ohio House itself when Ohio House, along with every group home CUP applicant located less then 650 feet away from another permitted group home or licensed drug and alcohol treatment facility, had its CUP and reasonable accommodation request denied and was ordered to cease operating pursuant to those regulations.  (Compare Opp. at 34-35 to Ohio Facts 47-53 [City never granted CUP or RA to group home that did not satisfy 650-foot separation requirement].)

The City's entire claim of "benefit" rested on the legally unsupported and unsupportable claim that group homes in general were "boardinghouses" that were accorded more favorable treatment than all other boardinghouses and that Ohio House itself "squarely fits the definition of boardinghouse and always has, and is a boardinghouse." (Closing, ECF 1209:2-24; Opp. 35.)  The text of the City's Zoning Code establishes the legal fallacy of that assertion.

First, the City asserts – although no such determination was ever made by the City – that Ohio House fit within the definition of "boardinghouse" as adopted in Ordinance 00-05, a zoning ordinance enacted in 2000.  That ordinance enacted several new zoning definitions, including "boardinghouse," "residential service facility," and "residential care facility."  The content of each of these definitions was entirely rewritten in 2014 by the City in Ordinance 14-13, when it enacted the definitions that applied under its group home regulations (Ordinance 14-13, 15-11, 17-05).  Between 2000 and the adoption of Ordinance 14-13 in October 2014, the only zoning definition that approximates a sober living home similar to Ohio House's Wilson Property was "residential service facility," not a "boardinghouse."

Second, between 2000 and 2014, when the definition was repealed, the Zoning Code defined "residential service facility" as a "residential facility, *other than* a [licensed] residential care facility, *boardinghouse*, or single housekeeping unit, where the operator provides to the residents personal services, in addition to housing,

including, but not limited to, protection, supervision, assistance, guidance, training, therapy, or other nonmedical care." (Tr. Exh. 835, ECF 443-4 at 141 of 259 [Pre-2014 Zoning Code].)  Residential service facilities with six or fewer persons were permitted uses in all residential zones before Ordinance 14-13. (Tr. Exh. 835, ECF 443-4 at 161 of 259.)  This definition approximates Ohio House's Wilson Property which has provided supportive housing for recovering substance abusers since 2012. (Facts 1, 3, 8.)   The number of residents in each unit at the Wilson Property fluctuates between six and eight.  (Fact 2.)

Third, during that same period of time, 2000-2014, the operative criteria in the definition of boardinghouse was the housing for "guests," an undefined term. (Tr. Exh. 835, ECF 443-4 at 132-44 of 259.) The 2000 definition distinguished small from large boardinghouses. A "boardinghouse, small" was "[a] dwelling which is designed or used to accommodate a maximum of 3 *guests,* where *guestrooms* are provided in exchange for an agreed payment of a fixed amount of money or other compensation based on the period of occupancy." (Fact 111; Trial Exh. 835 at p. 5 [emphasis added], ECF 443-4 at 133 of 259.) A "boardinghouse, large" was "[a] dwelling which has all of the characteristics of a small  boardinghouse and which accommodates 4 or more guests." (Id.) The Zoning Code defined "guestroom" as "[a] room occupied or intended, arranged, or designed for occupancy by one or more guests." (Id., ECF 443-4 at 136 of 259.) The only other Zoning Code definitions utilizing the term "*guestroom*" are "hotel" and "motel." (ECF 443-4 at 137-138 of 259.) The City has never claimed that Ohio House was providing "guestrooms."

Fourth, as noted, Ordinance 14-13 replaced the definition "residential service facility" and incorporated its elements into the new definitions "group home" and "sober living home."  It further redefined "boardinghouse," removing the cap on the number of occupants.  (ECF 443-5 at 9-10 of 231.)  The definition of residential service facility is the forerunner of the definition of group home/sober living home, not the definition of boardinghouse.  Under the terms of the pre-Ordinance 14-13

1    Zoning Code, Ohio House was not a boardinghouse, but a residential service facility.

2    When that definition was repealed, Ohio House became a group home/sober living

3    home, not a boardinghouse.  Group homes/sober living homes with six or fewer

4    residents remained permitted uses in the MFR zones until Ordinance 15-11.

5           Fifth, the definition of boardinghouse as redefined in Ordinance 14-13 –

6           [a] residence or dwelling, other than a hotel, wherein rooms are rented

7           under two (2) or more separate written or oral rental agreements, leases

8           or subleases or combination thereof, whether or not the owner, agent or

9           rental manager resides within the residence  –

10   by its terms would include every living situation where a dwelling is occupied by

11   persons who are a dwelling renting rooms, including a roommate situation.  (ECF

12   443-5 at 89, CMMC § 13-6; ECF 442 at 630:22-632:2 [Curtis].)  The only difference

13   between "small" and "large" boardinghouses is that a large boardinghouse rents out

14   three or more rooms without any occupancy cap and a small boardinghouse rents out

15   less than three rooms.  (ECF 442 at 630:22-632:2 [Curtis].)  As revised, the 2014

16   boardinghouse definition could be applied to any shared occupancy of any rental

17   dwelling in the City, a standard-less definition that explains why it was never

18   enforced or used by the City – until it was re-purposed as the nondisabled comparator

19   to justify the City's retroactive regulation of group homes in its R1 districts under

20   Ordinance 14-13.

21          Sixth, the City's misrepresentation of the plain text of its zoning definitions is

22   nothing new. At trial, it made the bald assertions that every group home was

23   previously defined as a boardinghouse; before trial, it made the bald assertion that

24   the definition of boardinghouse contained a cap occupancy, not rooms, at no more

25   than two guests for a small and three guests for a large.  Recall that before trial, the

26   City repeatedly told this Court that its boardinghouse definition "strictly limited" the

27   number of residents to six when, in fact, the definition contained no such limitation,

28   only referencing a limitation on rooms.  (See ECF 16 at 17-18 [City stating in its

-22-

motion to dismiss that boardinghouses have a strict limit of 6 person]; ECF 28 at 9 [Court's order stating that "boardinghouses have a strict limit of six residents"]; ECF 33 at 18 [City repeating same mischaracterization in its second motion to dismiss]; ECF 35 at 15 [Ohio House advising Court of City's repeated misrepresentations regarding the text of its regulations]; ECF 42 at 8 n.1 [Court's order acknowledging that its prior order had "mistakenly stated that boardinghouses were limited by the number of residents"]).  The City's misrepresentations regarding the text of its group home regulations continued throughout this case, including during trial. And since the analysis of a regulatory text is question of law, no jury is equipped to determine falsity from truth when a city claims its regulations do not actually mean what they plainly say.

Seventh, following the same pattern of misrepresenting the text of its code, the City contends that there was no facial discrimination because "[a]ny legally preexisting use, *including group homes*, were treated as nonconforming uses" in the R1 zones after passage of Ordinance 14-13.  (ECF 449 at p. 16, Fact 83.)  That claim is contradicted by the explicit terms of the Ordinance 14-13 requiring *all* existing group homes in the R1 zones with six or fewer persons – which were legally existing prior to adoption of the Ordinance – to obtain an SUP or close.  (Recall that boardinghouses, if they existed at all, were allowed to remain as nonconforming uses.) (See ECF 443-5 at 15 of 231, CMMC 13-312 [requiring existing homes to get SUP]; ECF 443-4 at 161 of 259, pre-Ord. 14-13 Land Use Matrix permitting residential service facilities with six or fewer residents in R1 zones].)  And the City continues with its specious claim that the Land Use Matrix requires boardinghouses to be either 650 feet (small boardinghouses) or 1,000 feet (large boardinghouses) away from any other boardinghouse, *and* any group home, sober living home, or licensed substance abuse treatment facility because group homes are "included" within the definition of boardinghouses.  (Opp. at 35; see ECF at 914:18-915:18 [Le].)  The plain text of the Land Use Matrix and definitions of boardinghouse, group

-23-

1  home, and sober living home together show that the City's representation of the terms

2  of its regulations is false as a matter of law.

3       Eighth, if, as the City now argues, the benefit to group homes flows from the

4  terms of its regulations, then that benefit is a question of law, based on the text of the

5  regulations, not the City's post hoc re-labeling of uses supported by nothing other

6  than its witness's testimony contradicting that text.   Moreover, not a scintilla of

7  evidence supports the City's assertion at trial that group homes/sober living homes

8  were boardinghouses or vice versa.   Nothing in the text of the rewritten definition of

9  boardinghouse and the simultaneous adoption of the new definitions group home and

10  sober living home gives any indication that a use meeting the definition of group

11  home/sober living home was also boardinghouse.[8]

12       Last, legislation is not so malleable.  It must be written in a manner which gives

13  appropriate notice of their terms.  The meaning of legal text, like the group home

14

---

15       [8]Nor was there any indication of that purported connection in the City's

16  office communications, application forms, or website. (Fact 86 [no indication on

17  City website]; ECF 442 at 387:13-389:3 [Planning Commission Resolution

18  ["Group home serving disabled persons . . . are not considered to be

boardinghouses."]; ECF 442 at 739:12-740:12, Exh. 198 [City letter to Ohio

19  House advising needed to apply for a group home permit; no mentio of

boardinghouse]; ECF 565:13-567:10 [same in City Council resolutions]; ECF 442

20  at 1004:22-24 [City's records maintain "group home" roster, not "boardinghouse"

21  roster].)  Every witness involved in or supervising the actual handling of group

home CUP applications testified that there was no connection to their knowledge.

22  (Fact 87; ECF 442 at 388:22-389:3 [Vander Dussen understanding that group

23  homes are not considered boardinghouses]; ECF 442 at 629:14-23 [Curtis had

24  never heard that group homes "substantially similar to boardinghouses"].)  And

the staff reports on a group home CUP applications repeatedly stated that group

25  homes are not boardinghouses.  (Fact 86; ECF 442 at 370:20-371:1 [never told

26  group home CUP applications that they could apply as a boardinghouse.)  That

27  evidence was so one-sided that the Court refused to admit the set of staff reports

repeating that same statement over and over again.  (See ECF 442 at 1035:11-

28  1039:7.)

regulations, must be decided by the Court, not interested witnesses who testify to an entirely new interpretation of the ordinance after the start of litigation.   The unfairness of allowing a city to change interpretations midstream is illustrated by what actually occurred in this case.   Prior to adoption of Ordinance 14-13, Ohio House met the definition of a residential service facility, not a boardinghouse, as shown above.   When Ordinance 14-13 amended the definition of boardinghouse and adopted the definition group home/sober living home, had the City's current position been evidence – that a use qualifying as a group home was also considered a boardinghouse – Ohio House could, with minimal effort, have arranged is operation to qualify as a "boardinghouse, small" renting two or fewer rooms.   It would have been a matter of having the same number of residents occupy two bedrooms rather than three.   That use would have been permitted and, prior to Ordinance 15-11, was not subject to any spacing requirement.   To ensure that the text of its ordinances satisfy a constitutionally required modicum of notice of what they do and do not allow, the City cannot be allowed to present a post hoc interpretation of its code neither support by the ordinances' text nor by contemporaneous interpretation.

### III.  CONCLUSION

Because the facts are undisputed and Ohio House is entitled to judgment as a matter of law, the Court should enter judgment in Ohio House's favor under Government Code § 65008 and enjoin the City from requiring Ohio House to cease operations or pay fines pursuant to the City's group home regulations.

Dated:  June 27, 2022.

Respectfully submitted,

BRANCART & BRANCART

*/s/ Elizabeth Brancart*
Brancart & Brancart

Attorneys for Plaintiff The Ohio House LLC

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

Pursuant to Rule 5 of the Federal Rules of Civil Procedure, on June 27, 2022, I served by the ECF system a copy of the attached document – **PLAINTIFF THE OHIO HOUSE LLC'S REPLY IN SUPPORT OF ENTRY OF JUDGMENT ON ITS GOVERNMENT CODE § 65008 CLAIM** – on the following attorneys:

Samantha E. Dorey
Seymour B Everett, III
Christopher D. Lee
Everett Dorey LLP
18300 Von Karman Avenue Suite 900
Irvine, CA 92612
Fax: (949) 377-3110
sdorey@everettdorey.com
severett@everettdorey.com
clee@everettdorey.com

Kimberly Hall Barlow
Bruce Lindsay
Monica Choi-Arredondo
Jones Mayer
3777 North Harbor Boulevard
Fullerton, California 92835
Fax: (714) 446-1448
khb@jones-mayer.com
bal@jones-mayer.com
mca@jones-mayer.com

*/s/ Elizabeth Brancart*

-26-