BRANCART & BRANCART
  Christopher Brancart (SBN 128475)
  cbrancart@brancart.com
  Elizabeth Brancart (SBN 122092)
  ebrancart@brancart.com
P.O. Box 686
Pescadero, CA 94060
Tel:   (650) 879-0141
Fax:   (650) 879-1103

Attorneys for Plaintiff The Ohio House LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE OHIO HOUSE LLC, | No.  8:19-cv-01710-JVS-GJS |
| Plaintiff, | **PLAINTIFF THE OHIO HOUSE LLC'S NOTICE OF RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW AND FOR NEW TRIAL; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF; DECLARATION OF CHRISTOPHER BRANCART** |
| vs. | |
| CITY OF COSTA MESA, | |
| Defendant. | |
| | Hearing: |
| | Date:       November 14, 2022 |
| | Time:       1:30 p.m. |
| | Courtroom:  JVS |

Please take notice that on November 14, 2022, at 1:30 p.m., plaintiff The Ohio House LLC will move the Honorable James V. Selna, United States District Judge, for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b) or, in the alternative, for a new trial pursuant to Fed. R. Civ. P. 59(a)(1).

The renewed motion for judgment as a matter of law is made on the grounds that the evidence on plaintiff's claims for facial discrimination, disparate treatment, discriminatory statements, interference, and failure to make a reasonable accommodation under the federal Fair Housing Act and California Fair Employment and Housing Act permits only one reasonable conclusion and that that conclusion is

contrary to the jury's verdict.  The motion for new trial is made on the grounds that the verdict is contrary to the clear weight of the evidence and is necessary to prevent a miscarriage of justice.

This motion is based on this notice of motion, the memorandum of points and authorities set forth herein, Declaration of Christopher Brancart, and attached exhibits, all the Court's records and files in this action, and on such other and further written and oral argument and authorities as may be presented at or before the hearing on this matter.

This motion also relies on the Trial Transcripts and Trial Exhibits previously filed at ECF 442, 443, and 444.  Plaintiff will provide courtesy copies of those prior filings along with the copy of this motion.

This motion is made by plaintiff following the conference of counsel pursuant to CDLR 7-3 which took place on September 26, 2022.  Counsel agreed to a briefing schedule which the Court approved. (ECF 464.) On October 4, 2022, the Court granted Ohio House's request for leave to file a 30-page brief.  (ECF 466.)

Dated:  October 4, 2022.

Respectfully submitted,

BRANCART & BRANCART

*/s/ Elizabeth Brancart*
Brancart & Brancart

Attorneys for Plaintiff The Ohio House LLC

# TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.  Ohio House is entitled to judgment as a matter of law. . . . . . . . . . . . . . . . . . . . . 2

    A. Ohio House is entitled to judgment on facial discrimination. . . . . . . . . . 2

        *1. Ohio House established facial discrimination.* . . . . . . . . . . . . . . . . 3

        *2. The City failed to justify its facial discrimination.* . . . . . . . . . . . . 3

        a. Group homes were not treated better than boardinghouses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        b.  Boardinghouse had fewer disqualifying restrictions. . . . . . . . . . 6

        c.  The City failed to establish legally cognizable justifications or support them with evidence. . . . . . . . . . . . . . . . . . . 8

    B.  Ohio House established its discriminatory statements claims. . . . . . . . 11

    C.  Ohio House established its pattern or practice claims. . . . . . . . . . . . . . 11

    D.  Ohio House established its interference claims. . . . . . . . . . . . . . . . . . . 14

    E.  The City's reasonable accommodation requirements are unlawful. . . . . 16

    F.  The City unlawfully refused to make accommodations. . . . . . . . . . . . . 16

II.  The Court should grant a new trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    A.  The Court committed error in instructions and the verdict form. . . . . . 17

        *1. Errors re facial discrimination and justification* . . . . . . . . . . . . . 18

        *2. Errors re interference* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

        *3. Refusal to instruct on Ohio House's theories* . . . . . . . . . . . . . . . 22

        *4. Refusal to instruct on preemption* . . . . . . . . . . . . . . . . . . . . . . . . 23

    B.  The Court erred in admitting inflammatory testimony. . . . . . . . . . . . . . 23

    C.  The Court erred in excluding relevant evidence . . . . . . . . . . . . . . . . . . 27

        *1. HCD and HUD/DOJ documents* . . . . . . . . . . . . . . . . . . . . . . . . . 27

        *2. Other evidence* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

    D.  The jury's verdict is against the weight of evidence . . . . . . . . . . . . . . . 30

# TABLE OF AUTHORITIES

## CASES

*Anderson v. City of Blue Ash,* 798 F.3d 338 (6th Cir. 2015) . . . . . . . . . . . . . . . . . 17

*Big Rock Drive, Malibu, Cal. 90265,* 51 F.3d 1402 (9th Cir. 1995) . . . . . . . . . . 22

*Bischoff v. Brittain,* 183 F. Supp. 3d (E.D. Cal. 2016) . . . . . . . . . . . . . . . . . . . . . 9

*Bostock v. Clayton Cnty.,* 140 S.Ct. 1731 (2020) . . . . . . . . . . . . . . . . . . . . . . . 7, 25

*Brillhart v. Philips Elec. Northern American Corporation,*

   938 F. Supp. 742 (D.N.M. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Broadcom Corporation v. Emulex Corporation,*

   No. CV-10-03963-JVS-ANX, 2011 WL 13131131 (C.D. Cal. Dec. 16, 2011) . . 12

*Cerros v. Steel Techs., Incorporated,* 398 F.3d 944 (7th Cir. 2005) . . . . . . . . . . 25

*City of Edmonds v. Washington State Building Code Council,*

   18 F.3d 802 (9th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*City of Norwalk v. Auction City, Incorporated,* 186 Cal. App. 2d 287 (1960) . . . . 4

*Community House, Incorporated v. City of Boise,* 490 F.3d 1041 (9th Cir. 2007). 3

*Colony Cove Properties, LLC v. City of Carson,* 888 F.3d 445 (9th Cir. 2018). . . 2

*Crowder v. Kitagawa,* 81 F.3d 1480 (9th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . 17

*Elijah Grp., Incorporated v. City of Leon Valley,* 643 F.3d 419 (5th Cir. 2011) . . 3

*Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd,*

   762 F.3d 829 (9th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Harang v. Schwartz*, No. CV-13-0058, 2014 WL 12724985

   (E.D. La. June 4, 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Hum. Resources Rsch. and Management Grp., Incorporated v. Cnty. of Suffolk,*

   687 F. Supp. 2d 237 (E.D.N.Y. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*Horizon House Developmental Servs., Incorporated v. Township of Upper*

   *Southampton*, 804 F. Supp. 683, 700 (E.D. Pa. 1992). . . . . . . . . . . . . . . . . . . . 17

*FM Properties Operating Company v. City of Austin,*

   93 F.3d 167 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Frost v. BNSF Railway Company,* 914 F.3d 1189 (9th Cir. 2019) . . . . . . . . . . . . 22

*Green v. New Jersey Mfrs. Insurance Company,* 160 N.J. 480 (N.J. 1999) . . . . . 26

*Haibo Jiang v. Town of Tonawanda*, No. 15-CV-898-A, 2018 WL 2440122 . . . 25

*Harang v. Schwartz,*No.CV-13-0058, 2014 WL 12724985 (E.D.La. 2014). . . . . 25

*Hidden Village., LLC v. City of Lakewood,* 734 F.3d 519 (6th Cir. 2013) . . . . . . 22

*Horizon House Developmental Servs., Incorporated v. Township of Upper*

    *Southampton,* 804 F. Supp. 683 (E.D. Pa. 1992). . . . . . . . . . . . . . . . . . . . . . . . . 9

*Islam v. City of Bridgeton,* 804 F. Supp. 2d 190 (D.N.J. 2011). . . . . . . . . . . . . . 25

*Jerden v. Amstutz,* 430 F.3d 1231 (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . 17

*John v. Superior Ct.,* 63 Cal. 4th 91 (2016). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Larkin v. State of Mich. Department of Social Servs.,*

    89 F.3d 285 (6th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Lujan v. Minagar,* 124 Cal. App. 4th 1040 (2004) . . . . . . . . . . . . . . . . . . . . . . . 13

*MCI Exp., Incorporated v. Ford Motor Company,*

    832 So. 2d 795 (Fla. District Ct. App. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Molski v. M.J. Cable, Incorporated,* 481 F.3d 724 (9th Cir. 2007). . . . . . . . . . . . 17

*Montana Fair Housing., Incorporated v. City of Bozeman,*

    854 F. Supp. 2d 832 (D. Mont. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 11

*Oxford House-C v. City of Street Louis,* 77 F.3d 249 (8th Cir. 1996). . . . . . . . . . 11

*Potomac Grp. Home Corporation v. Montgomery Cty.,*

    823 F. Supp. 1285 (D. Md. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Ralston Purina Company v. Hobson,* 554 F.2d 725 (5th Cir. 1977). . . . . . . . . . . 11

*Reeves v. Sanderson Plumb. Production., Incorporated,*

    530 U.S. 133 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Revock v. Cowpet Bay Western Condominium Association,*

    853 F.3d 96 (3d Cir. 2017). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Sameric Corporation v. City of Philadelphia,* 142 F.3d 582 (3d Cir.1998) . . . . . . 4

*Schwarz v. City of Treasure Island,* 544 F.3d 1201 (11th Cir. 2008) . . . . . . . . . . 16

*Sjolund v. Musland,* 847 F.2d 1573 (Fed. Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . 13

*Smith v. Stechel,* 510 F.2d 1162 (9th Cir.1975) . . . . . . . . . . . . . . . . . . . . . . . 14, 22

*Stewart B. McKinney Foundation., Incorporated v. Town of Fairfield,*
    790 F. Supp. 1197 (D. Conn. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Supp.* 3d 1080, 1090 (E.D. Cal. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Swanston v. City of Plano,* 557 F. Supp. 3d (E.D. Tex. 2021) . . . . . . . . . . . . . . 16

*Swinton v. Potomac Corporation,* 270 F.3d 794 (9th Cir. 2001) . . . . . . . . . . . . 25

*The Park at Cross Creek, LLC v. City of Malibu,* 12 Cal. App. 5th (2017) . . . . . . 6

*United States v. City of Chicago Heights,* 161 F. Supp. 2d 819 (N.D. Ill. 2001) 7, 9

*United States v. City of Hayward,* 36 F.3d 832 (9th Cir. 1994) . . . . . . . . . . . . . 14

*United States v. Heller,* 785 F.2d 1524 (11th Cir. 1986). . . . . . . . . . . . . . . . . . . 25

*United States v. Skillman,* 922 F.2d 1370 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . 26

*United States v. Weitzenhoff,* 35 F.3d 1275 (9th Cir. 1993) . . . . . . . . . . . . . . . . . 4

*Young v. Haines,* 41 Cal. 3d 883 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

**FEDERAL STATUTES**

42 U.S.C. § 3601. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4

42 U.S.C. § 3604(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

42 U.S.C. § 3615. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Fed. R. Civ. P. 50 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Fed. R. Civ. P. 50(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fed. R. Civ. P. 59(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fed. R. Evid. 403 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

**STATE STATUTES**

Cal. Government Code § 12900 et seq. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Cal. Government Code § 65008 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 27, 28

Cal. Government Code § 12927(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Cal. Government Code § 12955(l). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Cal. Government Code § 12955.6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

**INTRODUCTION**

Plaintiff The Ohio House LLC renews its motion for judgment as a matter of law under the federal Fair Housing Act, 42 U.S.C. § 3601 *et seq.* ("FHA"), and California Fair Employment and Housing Act, Government Code § 12900 *et seq.* ("FEHA"). In the alternative, the Court should order a new trial because evidentiary and instructional errors resulted in a miscarriage of justice and the jury's verdict is against the substantial weight of the evidence.

**BACKGROUND**

Prior to trial the parties filed cross-motions for summary judgment and partial summary judgment on Ohio House's claims under the FHA, FEHA and Government Code § 65008 including, *inter alia*, whether the facially discriminatory regulations provided a "benefit" to the disabled justifying facial discrimination. (ECF 207, 216, 229; ECF 211, 224, 226.) The City argued that its Zoning Code provided a beneficial exception for group homes from the stricter boardinghouse regulations and Ohio House argued that that same text established that group homes were subject to requirements imposed on no other residential facilities, imposing a burden, not a benefit. (ECF 245 at 22.) Although the City agreed with Ohio House that the Court could properly make the decision as to whether the *text* of the ordinances provided a benefit to persons with disabilities, the Court concluded that the parties "have presented conflicting evidence that establishes a genuine dispute" as to whether the regulations benefit or burden the disabled. (ECF 246 at 24:10-25; ECF 245 at 23.)

Before trial on March 30, 2022, Ohio House filed a formal objection to a jury trial on its claims based on facial discrimination on the grounds that those claims must be decided by the Court as a matter of law. (ECF 357; see also ECF 324 at 33-36.) Before the case was submitted to the jury, Ohio House moved for, and the Court denied, judgment as a matter of law on the same grounds set forth below. (ECF 414; Trial Transcript ["RT"] filed previously as ECF 442, 4/13 at 141:8-143:15.) On April 18, 2022, the jury returned a verdict in favor of the City on all claims under the FHA

-1-

1  and FEHA and an advisory verdict in favor of the City on Ohio House's § 65008

2  claim. (ECF 427.) The Court subsequently denied Ohio House's motion for entry of

3  judgment, holding that the § 65008 claims were time-barred and, even if they were

4  not, failed, and entered final judgement. (ECF 457 at 28; 462.)

5  **ARGUMENT**

6  **I. Ohio House is entitled to judgment as a matter of law.**

7  Under Fed. R. Civ. P. 50, a jury's verdict should be overturned and judgment

8  as a matter of law entered "'when the evidence permits only one reasonable

9  conclusion and the conclusion is contrary to that reached by the jury.'" *Colony Cove*

10  *Properties, LLC v. City of Carson*, 888 F.3d 445, 450 (9th Cir. 2018) (quotation

11  omitted). The court must view the evidence in the light of and draw all reasonable

12  inferences in the nonmoving party's favor. *Id.* But it should also give credence to

13  "evidence supporting the moving party that is uncontradicted and unimpeached, at

14  least to the extent that that evidence comes from disinterested witnesses." *Reeves v.*

15  *Sanderson Plumb. Prod., Inc.*, 530 U.S. 133, 151 (2000). The evidence relied on by

16  Ohio House here involves issues of law, comes from the City's own witnesses and

17  official documents and admissions and, where it does not, was neither contradicted

18  nor impeached by the City.[1] If the Court grants any part of Ohio House's Rule 50(b)

19  motion, it should order a new trial on damages and set a hearing on equitable relief.

20  **A. Ohio House is entitled to judgment on facial discrimination.**

21  The plain text of the City's group home regulations and Zoning Code

22  establishes both facial discrimination and refutes the City's attempt to rely on that

23  same text to justify its facial discrimination as a benefit to disabled persons that is

24  ───────────────

25  [1]Facts regarding Ohio House and structured sober living are at issue in this

26  motion. For background, those facts are recited in ECF 446 at 2-5, 39-41, Facts 1-9, 93-100 (OH proposed findings of fact in support of judgment pursuant to Govt.

27  Code § 65008) and ECF 457 at 2-3, 8-10 (Court's order on OH's motion).

28  Detailed explications of the City's zoning regulations also may be found in both. See ECF 446 at 5-8, 11-13, 14-17, Facts 10-16, 24-26, 31-37; ECF 457 at 4-8.

outweighed by the burden imposed on disabled persons.

### 1. Ohio House established facial discrimination.

Ohio House identified facially discriminatory provisions of the City's regulations. (RT 4/14 at 48:8-49:5 [ECF 442 at 1169].) The Court instructed the jury that it "must accept as true that Ohio House has offered sufficient evidence to prove that [those seven] group home regulations are facially discriminatory,"(id.), an instruction that "ma[d]e clear that the only remaining question [for the jury] was whether [the regulations] they were justified." (ECF 457 at 22.)

### 2. The City failed to justify its facial discrimination.

Once facial discrimination is established, the defendant may avoid liability only by establishing its affirmative defense of justification under *Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1050 (9th Cir. 2007). The Court instructed the jury on the elements of that defense by proof of benefit or safety. (ECF 423 at 26-32.)

Throughout trial the City focused on the benefit justification and its position was clear – the benefit to disabled persons in their housing opportunities was anchored in the text of the Zoning Code which, the City asserted, treated group homes more favorably than boardinghouses. (See RT 4/13 at 155:11-22, 159:20-160:16, 161:16-162:3. [Le] [ECF 442 at 911, 913-17 .) But the Court instructed the jury that the City could not justify facial discrimination "by claiming that it treats others less favorably than it treats group homes for persons with disabilities." (RT 4/14 at 52:7-10 [ECF 442 at 1171]; ECF 423 at 32.) That instruction, as a matter of law, foreclosed the City's defense of benefit based on worse treatment of boardinghouses.

Even if the City could demonstrate benefit by showing its worse treatment of boardinghouses, that defense failed on the merits. Proof required the City to show that the *text* of the ordinances provided the purported benefit. *Cf., e.g., Elijah Grp., Inc. v. City of Leon Valley*, 643 F.3d 419, 424 (5th Cir. 2011) (under RLUIPA "less than equal terms" must be measured by the ordinance itself and the criteria by which it treats institutions differently). And, the benefit provided by the text must outweigh

1   any burden imposed.  The City did not claim that the plain text of its regulations was

2   other than what Ohio House established; it only claimed that the plain text did not

3   mean what it said. But construction of a municipal zoning ordinance is a question of

4   law, not a question of fact for the jury to decide.  *City of Norwalk v. Auction City,*

5   *Inc.*, 186 Cal. App. 2d 287, 290 (1960) (normal rules of statutory construction apply).

6   Here the Court erred in treating the terms of the City's Zoning Code as a

7   question of fact in dispute and in asking the jury to weigh the benefits provided and

8   burdens imposed by the Code and whether the City had chosen the least restrictive

9   means of attaining its purpose.  (RT 4/14 at 50:5-20 [ECF 442 at 1171].) It is the

10  traditional duty of the court to construe the validity of an ordinance, its benefits, and

11  its justifications.[2] Asking the jury to decide the terms of the City Zoning Code based

12  on judging the credibility of witnesses testifying about its terms is error.  *See*,

13  *e.g.*,*United States v. Weitzenhoff*, 35 F.3d 1275, 1287 (9th Cir. 1993) (trial court

14  impermissibly delegated its legal duties when it allowed parties in jury trial to give

15  conflicting testimony regarding the terms of art and legal obligations imposed by a

16  discharge permit and failed to resolve those legal issues itself). Allowing the jury to

17  make legal decisions on application of the FHA frustrates the policy behind the FHA

18  "to provide, . . . for fair housing throughout the United States." 42 U.S.C. § 3601.

19  As a matter of statutory analysis, the text of the City's regulations fails to

20  support its justification of a "benefit" outweighing the burden on persons with

21  disabilities.  First, the regulations do not treat group homes more favorably than

22  boardinghouses.  Second, the text does not support the City's claim that

23  boardinghouses must comply with the group home restrictions.  And separately, the

24

25

26  [2]See *FM Properties Operating Co. v. City of Austin*, 93 F.3d 167, 172 n.6
    (5th Cir. 1996) ("Whether a particular zoning action has the requisite rational

27  relationship to a legitimate government interest is a question of law to be decided
    by the court."); *Sameric Corp. v. City of Philadelphia*, 142 F.3d 582, 591 (3d

28  Cir.1998) (same).

1    City failed to justify each facially discriminatory provision as required.  (RT 4/14 at

2    49:19-50:1 [ECF 442 at 1170-71]; ECF 423 at 26.)

3              **a. Group homes were not treated better than boardinghouses.**  The

4    City's claim that it treated group homes better than boardinghouses is belied by the

5    text of the Zoning Code.  From October 2014 until just several months before trial in

6    January 2022, the City Code defined "boardinghouse" based on the number of *rooms*

7    rented, not the number of occupants.  (See Tr. Exhs. 1653 at 7-9, 1659 [ECF 443-5].)

8    A small boardinghouse meant two or fewer rooms rented; a large boarding house

9    meant three to six rooms (or more) being rented.  (Tr. Exh. 1653 at 7, Tr. Exh. 1655

10   at 6 [ECF 443-5].)  The definition of "boardinghouse" had no occupancy limit until

11   2022 which was *years* after the City denied Ohio House's CUP and took action

12   against it. (Tr. Exh. 1659 [ECF 443-5], 182, 188, 189 [ECF 443-3], 198 [ECF 444-1],

13   196, 201 [ECF 443-3], 218, 219b, 219c [ECF 444-1], 907, 909 [ECF 443-4], 923a

14   [CB Dec. Exh. 9]; ECF 347 at 13.) And, unlike the detailed Zoning Code Chapters

15   XV and XVI applicable exclusively to group homes, the only boardinghouse

16   regulations are (1) the definition in CMMC 13-6 (Tr. Exh. 1660 at 4 [ECF 443-5]),

17   and (2) the Land Use Matrix.  (Tr. Exh. 1663 at 3, 21 n.7 [ECF 443-5]).

18         The City's amendment to the boardinghouse definitions effective 2022 had no

19   relevance to its treatment of Ohio House. When the City regulated Ohio House, while

20   a boardinghouse that rented two or fewer rooms was a permitted use in the MFR

21   zones no matter the number of occupants, Ordinance 15-11 imposed a new permit

22   requirement on all group homes for disabled persons of occupancy or rooms.  (Tr.

23   Exh. 1655 at 8 [ECF 443-5].) A group home with six or fewer residents needed a

24   special use permit and a group home with seven or more residents needed a

25   conditional use permit (CUP) and operating permit to operate or to continue to

26   operate in the MFR zones. (Id. at 7-8.) In contrast, because small boardinghouses had

27   no permit requirement – and thus no *new* permit requirement – existing

28   boardinghouses did not have to retroactively comply with a 650-foot separation

requirement. (Id. and p. 12.) And the permit required of large boardinghouses was
the standard CUP, while group homes with seven or more persons had to obtain a
CUP *and* an operator's permit (as a condition for obtaining and maintaining their
CUP). (Compare Tr. Exh. 1667 and 1668 [ECF 443-5]with Tr. Exh. 1663 at 3, 21
and Tr. Exh. 1662 at pp. 1-7 [ECF 443-5], CMMC 13-28(b), 13-29(g).) The
operator's permit – imposed solely on group homes for seven or more disabled
persons – contained strict operating requirements, compliance with which was a
condition for maintaining the permit, which in turn was a condition for maintaining
the CUP. (Tr. Exh. 1655 at 7-8, 1668 [ECF 443-5].) The operator's permit imposed
a 24-hour onsite manager requirement, parking and Vehicle Code compliance rules,
eviction rules and – in the case of sober living homes – a "good neighbor" and
neighbor complaint policy. (Tr. Exh. 1668 at 2-5.) A violation of any one of those
conditions risked revocation of the operator's permit and the conditional use permit.
(Id. at 5, CMMC 9-376; Tr. Exh. 1667 [ECF 443-5], CMMC 13-323(c); Tr. Exh.
1662, CMMC 13-29(o) [ECF 443-5].) Boardinghouses requiring CUPs had none of
those conditions since they were not required to obtain an operator's permit. And,
since the operator's permit is non-transferable, unlike boardinghouse CUPs, group
home CUPs do not provide a right to continue the conditional use with the land. *The
Park at Cross Creek, LLC v. City of Malibu*, 12 Cal. App. 5th 1196, 1209 (2017)
(CUPs run with the land). Based on the text of the Code, the City treated group
homes less favorably than boardinghouses.

      **b. Boardinghouses had fewer disqualifying restrictions.** Nor were
boardinghouses subject to more disqualifying uses in calculating the separation
requirements as the City claimed because, under canons of statutory construction, a
boardinghouse is not a group home and, therefore, is not subject to a distance
separation from boardinghouses *and* group homes, sober living homes, and state
licensed drug and alcohol treatment facilities. (Tr. Exh. 1667, CMM 13-323(b) [ECF
443-5].) A "group home" is a "facility that is being used as a supportive living

environment for persons who are considered handicapped under state or federal law," and a "sober living home" is a subset of group home for persons recovering from addiction.  Neither include single housekeeping units.  (Tr. Exh. 1660 at p. 6, CMMC 13-6 [ECF 443-5].)  A "boardinghouse" is simply a residence or dwelling where "rooms are rented" and does not exclude single housekeeping units  (Id. at p.4.)  To construe the term "boardinghouse" as including "group homes" would lead to absurd results because, using that same criteria, every residential use in the City (other than hotels) that rents rooms under two or more written or oral leases would be a boardinghouse and subject to the boardinghouse regulations.  The ordinance must be construed to avoid absurd results and to avoid doubt as to its validity, here being void for vagueness. *John v. Superior Ct.*, 63 Cal. 4th 91, 96 (2016); *Young v. Haines*, 41 Cal. 3d 883, 898 (1986). It is inappropriate to allow the City to testify to terms in its ordinances that do not exist. *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1749 (2020) ("The people are entitled to rely on the law as written, without fearing that courts might disregard its plain terms based on some extratextual consideration.").[3]

Separate and apart from the plain text of the group home regulations, the City did not dispute that it applied a stricter definition of "overcrowding" to group homes than it did to any other residential use.  (RT 4/12 at 24:19-27:24 [ECF 442 at 780-83; Tr. Exh. 182 at 6 [ECF 443-4.)  That is a facially discriminatory policy. *United States*

---

[3]The plain text of the City's historic Zoning Code also establishes that the falsity of the City's claim that all group homes were "boardinghouses" prior to the adoption of the group home regulations.  (RT 4/13 at 70:2-72:2, 93:18-20 [Le] [ECF 442 at 1130-32, 1053].)  Between 2000 and 2014, when the definition was repealed, the Zoning Code defined "residential service facility" as a "residential facility, *other than* a [licensed] residential care facility, *boardinghouse*, or single housekeeping unit, where the operator provides to the residents personal services, in addition to housing."  (Tr. Exh. 835 at 5 [ECF 443-4]; Tr. Exh. 136 [ECF 443-2].)  In contrast, a "boardinghouse" was a dwelling designed to accommodate "guests." (Id. at 5.)  See also Tr. Exh. 150 at 7-11 [ECF 443-2] (City enforced again "residential service facilities").

1    *v. City of Chicago Heights*, 161 F. Supp. 2d 819, 844-45 (N.D. Ill. 2001).

2           **c.  The City failed to establish legally cognizable justifications or

3    support them with evidence.**  Besides failing to establish "benefit" based on the

4    terms of the Code, the justifications for facial discrimination fail as a matter of law.

5    The City's witnesses testified to general justifications for its group home regulations:

6    (1) promoting "safety and well-being of people that were living in sober-living

7    homes," (2) preventing the institutionalization of its neighborhoods and "clustering"

8    of group homes to allow "people in group homes and sober-living homes to live in

9    residential environments," (3) maintaining the residential character of neighborhoods;

10   (4) addressing complaints regarding "excessive noise, excessive cigarette smoke,

11   parking," and, (5) preventing overburden on the City's infrastructure.  (RT 4/14 at

12   122:5-21; RT 4/6 at 173:5-9, 4/7 at 29:13-30:1, 34:18-25; RT 4/8 at 118:8-120:24;

13   RT 4/12 at 49:3-12, 105:5-1-6, 134:18-135:5, 150:11-22, 173:15-174:1, 174:18-19,

14   [See ECF 442 at 1202, 399, 446, 451, 654-56, 805, 861, 890-91, 906, 929-30].) Under

15   the text of the City's Zoning Code. City repeatedly argued that its group home

16   regulations protected "the entire community." (RT 4/14 at 108:21-109:6, 118:5-8,

17   125:25-126:3, 136:15-19, 136:25-137:1 [ECF 442 at 1187-1217].)  It claimed the

18   650-foot separation requirement was (1) intended to prevent overconcentration,

19   "clustering," and institutionalization. (RT 4/12 at 150:11-151:19 [ECF 442 at 906-

20   07.) The Operator's Permit requirement was to "protect the occupants, tenants, clients

21   of unlicensed facilities." (RT 4/12 at 170:6-11 [ECF 442 at 926].)  The enhanced

22   notice to owners *and occupants* was "to provide as much public involvement and

23   public notice as possible." (RT 4/6 at 92:22-94:9, RT 4/7 at 32:1-34:6]; RT 4/12 at

24   171:17-172:1 [ECF 442 at 335-37, 448-51, 927-28].)  The enhanced application

25   disclosures were "to ensure that the people that were operating the sober-living home

26   had clean records" and had "no potential safety issues." (RT 4/7 at 32:25-33:7 [ECF

27   442 at 449-50].) It justified the Land Use Matrix by claiming that it did not actually

28   allow group homes in the I&R zones. (RT 4/12 at 185:1-186:24 [ECF 442 at 941-42.)

The City did not try to justify discrimination based on the nature of disability.

Those justifications fail as a matter of law. A defendant must have actual evidence to support its *Cmty. House* affirmative defense. *See Bischoff v. Brittain*, 183 F. Supp. 3d 1080, 1092 (E.D. Cal. 2016) (defendant failed to raise triable issue where justifications not based on evidence). Imposing different permitting conditions on housing for disabled persons violates the FHA and FEHA. 42 U.S.C. § 3604(b); Govt. Code §§ 12927(c), 12955(*l*). Here, the City came forward with no evidence to establish that its justifications were anything more than speculative, based on stereotypes, or the type of generalized justifications that can only satisfy the rational basis standard. It performed no studies on an appropriate separation requirement. (RT 4/13 at 91:1-15 [ECF 442 at 1051].) Separation requirements violate the FHA because they limit the housing choices of persons with disabilities. *Horizon House Developmental Servs., Inc. v. Twp. of Upper Southampton*, 804 F. Supp. 683, 697 (E.D. Pa. 1992). Preventing "institutionalization" or facilitating "normalization" or "assimilation" of disabled persons into the neighborhood are not legally cognizable justifications for facial discrimination. *Larkin v. State of Mich. Dep't of Soc. Servs.*, 89 F.3d 285, 291 (6th Cir. 1996); *Human Resource*, 687 F. Supp. 2d at 259; *United States v. City of Chicago Heights*, 161 F. Supp. 2d 819, 839 (N.D. Ill. 2001); *Horizon House*, 804 F. Supp. at 697. Nor does the interest of maintaining the character of the residential neighborhood or limiting secondary effects, such as parking, noise, or smoking, justify facial discrimination. *Montana Fair Hous., Inc. v. City of Bozeman,* 854 F. Supp. 2d 832, 839 (D. Mont. 2012); *Bischoff v. Brittain*, 183 F. Supp. 3d 1080, 1090 (E.D. Cal. 2016). A 24-hour supervision requirement, imposed solely on group homes by the operator's permit, violates the FHA. *Hum. Res. Rsch. & Mgmt. Grp., Inc. v. Cnty. of Suffolk*, 687 F. Supp. 2d 237, 262 (E.D.N.Y. 2010). *See also Sailboat Bend Sober Living, Inc. v. City of Fort Lauderdale*, 46 F.4th 1268, 1277 n.2 (11th Cir. 2022) (noting that 24-hour supervision requirement imposed on group homes and no others treats the protected group less favorably). As for the application and notice

requirements, the City could not prove justification by merely claiming that those requirements did not result in permit denials.  Rather, the City was required to show that the provisions "benefit persons with disabilities in their housing opportunities." (RT 4/14 at 49:11-15 [ECF 442 at 1170].)  It made no attempt to do so.  Mere assertions and claims that regulations will help disabled residents integrate into the neighborhood and help eliminate discord between them and neighbors do not discharge a city's evidentiary burden.  *Potomac Grp. Home Corp. v. Montgomery Cty.*, 823 F. Supp. 1285, 1289, 1296 (D. Md. 1993); *Hum. Res. Rsch. & Mgmt. Grp., Inc. v. Cnty. of Suffolk*, 687 F. Supp. 2d 237, 260 (E.D.N.Y. 2010).  The City offered no evidence to establish that that restriction benefitted persons with disabilities in their housing opportunities.  The City did not justify applying a stricter "overcrowding" definition to group homes.  Nor could it explain how closing *existing* group homes "benefitted" the housing opportunities of persons with disabilities. Nor did the City make any effort whatsoever to establish the strict requirements of the safety prong of the *Cmty. House* defense beyond vague references to "safety" and "protection."  (RT 4/6 at 173:5-9, RT 4/7 at 29:13-30:1 [Vander Dussen]; RT 4/12 at 170:6-11 [Le] [ECF 442 at 299, 446, 926].)The Court instructed the jury that the City must separately justify each facially discriminatory provision. (RT 4/14 at 49:6-50:20 [ECF 442 at 1170-71.)   The City also failed to establish that its group home regulations were the least restrictive alternative under FEHA. It never enforced its general nuisance laws against group homes to address any concern regarding their "secondary effects." (Tr. Exh. 660 [ECF 443-4]; RT 4/13 at 138:15-140:1 [ECF 442 at 1098-1200]; Tr. Exh. 769, 770 [ECF 444-1]; Tr. Exh. 341 [ECF 443-4.)

This case is unlike other cases in which courts found that the benefit of an ordinance outweighed the burdens it imposed.  In such cases, the ordinances at issue allowed group homes for persons with disabilities a unique opportunity to operate where *all others* were denied that opportunity. *See, e.g., Sailboat Bend Sober Living, Inc. v. City of Fort Lauderdale*, 46 F.4th 1268, 1277 (11th Cir. 2022) (*no* use but

group home with permit could have more than three unrelated residents); *Oxford House-C v. City of St. Louis*, 77 F.3d 249, 251 (8th Cir. 1996) (same). Opinions as to whether any particular condition is a "burden" miss the point. (RT 4/12 at 170:22-23 [Le]; RT 4/14 at 134:1-6 [closing] [ECF 442 at 926, 1214].) It is the imposition of the condition because of protected class that is the burden.

Because the Court failed to decide benefit as a matter of law, Ohio House was forced to walk through Zoning Code with City witness Jennifer Le to attempt to show, through cross-examination, that Ms. Le's testimony regarding the content of the City's group home ordinances was untrue. (RT 4/13 at 13:9-33:23, 57:14-61:2 [Le] [ECF 442 974-93, 1017-21.) Ms. Le testified contrary to terms of ordinance and defense counsel repeated those mischaracterizations in closing. ([ECF 442 at 896-918, 1055, 1209]; RT 4/12 at 140:20-142:8, 158:18-160:16, 161:16-162:3; RT 4/13 at 95:4-11, 21, RT 4/14 at 129:1-24; Brancart Dec. attached ["CB Dec."] Exh. 2 at 38-40.) Where there is no support for a party's self-interested testimony, a jury must not be allowed to speculate. A directed verdict "is the proper safeguard against such speculation by the jury." *Ralston Purina Co. v. Hobson*, 554 F.2d 725, 729 (5th Cir. 1977). Ms. Le's testimony cannot support the verdict.

**B. Ohio House established its discriminatory statements claims.**

When a court determines that a zoning regulation is facially discriminatory, it should also find that it violates § 3604(c) and § 12955(c). *Mont. Fair Hous., Inc. v. City of Bozeman*, 854 F. Supp. 2d 832, 839 (D. Mont. 2012); 2 C.C.R. § 12042(g)).

**C. Ohio House established its pattern or practice claims.**

The Court instructed the jury that Ohio House could prove its pattern and practice claim by establishing that disability was "one motivating factor" behind the City's enacting and implementing group home regulations and polices that restricted housing opportunities for disabled persons that discrimination was the City's "standard operating procedure." (ECF 423 at 33.) Here no reasonable jury could have concluded anything but that Ohio House had proved its claim.

Judgment may be entered in favor of the moving party on an issue as to which it has the burden of proof where admissions by the opposing party's witnesses show that the moving party is entitled to such judgment. *See Broadcom Corp. v. Emulex Corp.*, No. CV-10-03963-JVS-ANX, 2011 WL 13131131, at *2 (C.D. Cal. Dec. 16, 2011). Rare in discrimination cases, plaintiff here presented evidence of the City's open admissions to the California Department of Housing and Community Development ("HCD") that disability was a motivating factor in its adoption of the group home regulations. (See [ECF 443-4] Tr. Exh. 741, p. 8 [MFR regulations adopted "to limit the number and concentration of group homes and sober living facilities" in the MFR zones]; see also Tr. Exh. 742, p. 36; Tr. Exh. 743, p. 37; Tr. Exh. 744, p. 37; Tr. Exh. 745, p. 39; RT 4/8 at 63:22-65:9, 65:9-66:16, 69:7-76:20, 78:9-79:7 [Curtis] [ECF 442 at 599-615).)  The City's primary witness Jennifer Le also *admitted* that the City intended to limit the number of existing group homes in its residential neighborhoods and require them move further apart into other neighborhoods, testifying that the intention of the City's group home regulations was to "spread out" the group homes so that the City would "not be seeing the complaints and impacts that we were seeing." (RT 4/12 at 146:8-14, 150:23-151:9 [Le] [ECF 442 at 902-07.)  The group home regulations were "an alternative" to "going around and citing [all the group homes] and shutting them down. (RT 4/12 at 145:20-24 [Le] [ECF 442 at 901].)  And the City Council disregarded the City Attorney and Planning staff's advice regarding their concerns about the special notice and disclosure procedures applying only to group homes.[4] The jury was not free to disregard the City's own admissions in reaching its decision. Courts in analogous situations have found that the jury was required to believe such key admissions, resulting in judgment

---

[4]RT 4/6 at 98:4-99:25, 100:4-104:21, 126:11-24, 127:1-21, 129:24-130:3, 131:5-132:25, 134:4-135:3, 135:20-136:7, 187:8-188:2 [ECF 442 at 342-62, 412-13]; Tr. Exhs. 960, 964, 970 [ECF 443-4]; RT 4/6 at 9:8-24 [ECF 442 at 252].)

1   as a matter of law in favor of the moving party.[5]

2        Based on the Court's instructions, those admissions establish that the City
3   engaged in conduct prohibited by the FHA and FEHA, including "[r]estricting or
4   attempting to restrict the choices of a person in connection with the use or enjoyment
5   of a dwelling so as to discourage or obstruct choices in a community or neighborhood
6   because of disability," and "[a]ssigning any person to or limiting housing
7   opportunities in a particular section of a community or neighborhood because of
8   disability." (RT 4/14 at 47:7-23 [ECF 442 at 1168].) To "spread out" existing group
9   homes necessarily limits the number of such homes in a neighborhood and forces
10  homes to attempt to obtain a permit and relocate to other neighborhoods, as does
11  "limit[ing] the number and concentration" of group homes.

12       The same evidence establishes that the City's standard operating procedure was
13  discrimination with respect to its group home regulations. In addition, the City denied
14  every single reasonable accommodation request seeking waiver of the 650-foot
15  separation requirement, claiming that that separation requirement was fundamental
16  to its zoning scheme.  (RT 4/6 at 140:15-153:21 [ECF 442 at 366-79]; Tr. Exh. 101,
17  111 [ECF 443-1], 112 [ECF 443-2], 1178 [ECF 443-4]; RT 4/8 at 135:5-136:1 [ECF
18  442 at 671].) Although it received applications for 64 sober living homes and 11
19  licensed treatment facilities in R1 and MFR zones, it approved only 12 sober living
20  homes with six or fewer persons in the R1 zones and only two sober living homes in
21  the MFR zones, and eventually pursued abatement actions against 10 of those homes

22

23

24      [5]*See, e.g., Brillhart v. Philips Elec. N. Am. Corp.*, 938 F. Supp. 742, 745
    (D.N.M. 1996) (testimony of direct evidence of discriminatory motive was
25  evidence "that the jury was not a liberty to disbelieve"); *Sjolund v. Musland*, 847
    F.2d 1573, 1579 (Fed. Cir. 1988) (plaintiff's admitted prior knowledge of
26  invention was testimony that a reasonable jury could not freely disregard in
    determining patent dispute); *Lujan v. Minagar*, 124 Cal. App. 4th 1040, 1047
27  (2004) (supervisor's admission that she fired employee in part to for unlawful
28  purpose constituted undisputed evidence that trial court was not free to disregard).

in the MFR zones.  (RT 4/12 at 138:12-19, 4/13 at 53:12-54:9[Le] [ECF 442 at 894, 1013-14.)  Based on this evidence, Ohio House prevailed on this claim.

### D.  Ohio House established its interference claims.

The Court instructed the jury that to prove interference Ohio House had the burden of proving that: (1) it "was engaged in an activity protected under the [FHA] or FEHA," (2) "the City subjected Ohio House to an adverse action," and (3) "the City took that adverse action against Ohio House because Ohio House was engaged in activity protected under the Fair Housing Act." (RT 4/14 at 57:3-9, 65:11-13 [ECF 442 at 1178, 1186.) The Court instructed the jury that "[p]roviding housing to persons with disabilities is a protected activity" and that it "must accept as proven the fact that Ohio House provides or intends to provide housing for persons with disabilities." (ECF 423 at p. 40; RT 4/14 at 57:13-17 [ECF 442 at 1178].) Interfering with a property owner's ability to provide housing for persons protected under the FHA violates § 3617 as a matter of law. *United States v. City of Hayward*, 36 F.3d 832, 836 (9th Cir. 1994). Proof of successful is not required. *Id.* Requiring a housing provider to apply for a permit not required of others – or under different terms than required of others – because of disability of its residents constitutes interference under § 3617. *Stewart B. McKinney Found., Inc. v. Town of Fairfield*, 790 F. Supp. 1197, 1221 (D. Conn. 1992). Proof of interference does not require proof of a separate act of discrimination. *Smith v. Stechel*, 510 F.2d 1162, 1164 (9th Cir.1975)

The evidence was undisputed and overwhelming that the City subjected Ohio House to regulation under its group home regulations because it was providing housing for disabled persons.  No reasonable jury could have decided in favor of the City based on the City's own records and its employees' testimony.[6] ) Prior to its final

---

[6]See Group Home Roster, Exh. 654 [ECF 444-1]; RT 4/8 at 188:11-189:18; RT 4/12 at 123:14-18; Exh. 1232 [ECF 443-4]; RT 4/12 at 192:3-9 [Le]; RT 4/13 at 44:18-24 [Le]; Exh. 654 at p. 2-3 [ECF 444-1]; RT 4/8 at 188:11-194:24; 194:14-24 [Tucker]; City Notice, Exh. 218 at p. 1 [ECF 444-1]; Exh. 198 [ECF

1 denial of Ohio House's permit application, the City had never cited Ohio House's

2 property for violating any City rule or regulation. (RT 4/7 at 157:24-158:8 [Stump];

3 see Tr. Exh. 182 at p. 8 [ECF 443-3]; RT 4/7 at 77:12-78:12 [Vander Dussen].) After

4 it denied Ohio House's CUP application and Ohio House exhausted its appeals, the

5 City ordered it to cease operations as a group home and began citing it for continuing

6 to do so. (Exh. 196; Exh. 201 at pp. 4, 8, 12, 16, 20, 22, etc. [ECF 443-3].) Each

7 citation issued described the unlawful condition as "Operation of a group home/sober

8 living facility without City approval." (RT 4/13 at 132:15-135:16 [Karuga]; See, e.g.,

9 Exh. 201 at p. 4 [ECF 443-3].)  The only regulations referenced in the citations were

10 the group home regulations. No "boardinghouse regulation" was mentioned.  (RT

11 4/12 at 192:13-25 [Le].) The City admitted that it did not apply the boardinghouse

12 regulations to any group home, including Ohio House, or cite them for being

13 boardinghouses.  (See evidence in Part II.F below; RT 4/12 at 143:21-143:10, 4/13

14 at 70:2-74:11 [Le].)  And, the evidence established that the City was unaware of any

15 boardinghouses in the City, including as of 2015, the year it enacted the MFR group

16 home regulations.  (Tr. Exh. 243 [ECF 443-3]; RT 4/8 at 204:13-209:11; RT 4/12 at

17 21:11-18, 29:15-17.

18   The City did not contradict Ryan Stump's testimony that going through that

19 process had interfered with Ohio House's operations. (RT 4/7 at 159:8-24.)  Instead

20 the City focused its proof on evidence that it did not "retaliate" against Ohio House.

21 (See RT 4/12 at 182:22-183:11 [Le]; ECF 333 at 164 [City instruction 43B requiring

22 plaintiff to show that the City took action "with discriminatory intent to retaliate

23 against Ohio House]; RT 4/13 at 154:5-155:16.) Here no reasonable jury could have

24 found anything but that the City subjected Ohio House to its group home permitting

25 regime *because* Ohio House provided housing for persons with disabilities.  Jennifer

26 Le's testimony regarding the City's purpose that the City action against Ohio House

27 ———————————————

28 444-1]; RT 4/13 at 48:19-25 [Le]; CUP process, RT 4/12 at 193:8-25 [Le]; Exh. 182 [ECF 443-3].)

1    was because it was providing housing to persons with disabilities. (RT 4/12 at

2    143:15-147:14 [ECF 442 at 899-903.)  Ohio House proved interference.

3          **E.  The City's reasonable accommodation requirements are unlawful.**

4          Section 13-200.62(f) of the Zoning Code requires mandatory findings for

5    approval of a reasonable accommodation request, including "[w]hether the existing

6    supply of facilities of a similar nature and operation in the community is sufficient to

7    provide individuals with a disability an equal opportunity to live in a residential

8    setting." (Tr. Exh. 1664, CMMC 13-200.62(f)(7) [ECF 443-5].)  The City interprets

9    that provision, in conjunction with subsection (f)(2), to mean that no accommodation

10    is necessary if a group home applicant could find some other place in the City that

11    would satisfy the 650-foot group  home separation requirement. (RT 4/8 at 47:20-

12    48:7, 49:11-22, 50:11-53:7; 89:12-90:2, 134:10-137:1 [Curtis] [ECF 442 at 583-673.)

13    The City applied that interpretation to Ohio House.  (Tr. Exh. 182 at 53 [ECF 443-3].)

14    At trial, the City argued that there was "no evidence that [Ohio House] attempted to

15    relocate" and that "other properties are available" to rent in the City.  (RT 4/14 at

16    113:24-114:24, 135:2-6 [ECF 442 at 1193-1215]; see also RT 4/8 at 14:6-15:6 [ECF

17    442 at 550-51].)  But, as a matter of law, the availability of another dwelling in

18    "some" residential neighborhood within the city limits is irrelevant to the reasonable

19    accommodation analysis because the FHA protects the right of individuals to live in

20    the residence of *their choice* in the community.  *Schwarz v. City of Treasure Island*,

21    544 F.3d 1201, 1225-26 (11th Cir. 2008); *Swanston v. City of Plano*, 557 F. Supp. 3d

22    781, 798-99 (E.D. Tex. 2021).  (ECF 245 at ECF 245 at 28 [noting same].)  The

23    City's requirements are contrary to and preempted by the FHA and FEHA.

24          **F.  The City unlawfully refused to make accommodations.**

25          The City denied Ohio House's request for reasonable accommodation seeking

26    a reduction in the 650-foot separation requirement, along with the applications of

27    every other group home making the same request on the ground that any reduction

28

in the separation requirement would be a fundamental alteration of its Zoning Code.[7] That policy of refusing to make accommodations in the 650-foot separation requirement, freely admitted by the City, runs afoul of the FHA's reasonable accommodation mandate. (RT 4/6 at 141:11-21, 4/7 at 84:12-20, 4/12 at 23:22-24:2 ECF 442 at 367, 779-80].) "Requiring public entities to make exceptions to their rules and zoning policies is exactly what the FHAA does." *Anderson v. City of Blue Ash*, 798 F.3d 338, 363 (6th Cir. 2015); *City of Edmonds v. Washington State Bldg. Code Council*, 18 F.3d 802, 806 (9th Cir. 1994) (FHA imposes an affirmative duty to reasonably accommodate disabled persons). Enforcing categorical rules violates the City's duty to make reasonable accommodations. *Horizon House Developmental Servs., Inc. v. Twp. of Upper Southampton*, 804 F. Supp. 683, 700 (E.D. Pa. 1992). When Congress has passed anti-discrimination laws which require reasonable modifications to public health and safety policies, "it is incumbent upon the courts to insure that the mandate of federal law is achieved." *Crowder v. Kitagawa*, 81 F.3d 1480, 1485 (9th Cir. 1996). That policy, applied to Ohio House, violates the law.

## II. The Court should grant a new trial

The court should set aside the verdict and grant a new trial, even though supported by substantial evidence, where in the court's conscientious opinion, "the verdict is against the clear weight of the evidence," or "to prevent a miscarriage of justice." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007); FRCP 59(a). Cumulatively, the errors described below require setting aside the jury's verdict and ordering a new trial. *Jerden v. Amstutz*, 430 F.3d 1231, 1241 (9th Cir. 2005).

### A. The Court committed error in instructions and the verdict form.

---

[7]RT 4/6 at 141:3-144:6, RT 4/7 at 84:12-20  [Vander Dussen]; RT 4/8 at 50:3-10, 53:8-54:7, 135:5-136:1 [Curtis]; RT 4/12 at 151:16-152:1 [Le] [separation requirement a "fundamental aspect of the zoning"]; RT 4/12 at 23:3-24:4 [Bouwens-Killeen]; Tr. Exh. 101, 111 [ECF 443-1], 112 [ECF 443-2, 1178 [ECF 443-4].

### *1. Errors re facial discrimination and justification*

The Court refused to instruct the jury that the City's group homes were facially discriminatory, instead giving a watered-down instruction more deferential to the City that the jury merely had to "accept as true" that Ohio House had "offered sufficient evidence" to prove that specified provisions of the City's group home regulations were facially discriminatory. (ECF 423 at 24.) Prior to trial Ohio House attempted on multiple occasions to obtain a definitive ruling on whether the City's group home regulations were facially discriminatory under the *Cmty. House* framework, thereby shifting the focus at trial on the City's burden to prove its affirmative defense of justification.[8] The City took the position that the Court had *not* found the group home regulations to be facially discriminatory and, at the pretrial conference the Court agreed.  (RT 4/14 at 27:7-28:9 [ECF 442 at 1148-49].)

Ohio House attempted to obtain evidentiary rulings on what evidence the City could use to justify its facial discrimination.  (ECF 254.) The Court denied the motion in limine regarding the admissibility of justification evidence, denoting it a "stealth summary judgment motion." (ECF 347 at 1-2.) Immediately prior to trial Ohio House asked the Court to pre-instruct the jury to the effect that the Court had found that the group home regulations applied different regulations to the disabled than the non-disabled and must be justified by the City.  (ECF 334, 334-1 at 16, 25.) The Court declined to do so. (ECF 337.)

Without having obtained that definitive instruction that the City's regulations were facially discriminatory, Ohio House was forced to present lengthy expert testimony going through the City's ordinances and zoning code to establish the facial

---

[8]ECF 211 [partial summary judgment]; ECF 234 [request for argument on summary judgment seeking ruling on issues not decided in tentative]; ECF 261 at 2-3 [motion for pretrial ruling resolving issues of law re facial discrimination claim]; ECF 296 at 2-3 [opposition to City's application to strike motion for pretrial ruling]; ECF 269 at 5 [asking for partial summary judgment on issues of law presented and briefed but not ruled on in order to narrow trial issues].

discrimination. ([ECF 442 at 56-190, 283-321] RT 4/5 at 12-146, RT 4/6 at 40-78 [Connolly]; Tr. Exh. 280a [ECF 443-3].) During trial, the Court sustained the City's objection when Ohio House asked its expert Brian Connolly whether the regulations "are facially discriminatory." (RT 4/5 at 126:2-6.)  It let the City witnesses, however, testify as to the City's lack of discriminatory intent and how the regulations "benefitted" the disabled. (RT 4/7 at 34:18-25, 35:8-10, 36:4-37:10 [Vander Dussen] [ECF 442 at 451-54]; RT 4/12 at 56:16 [Clark]; RT 4/12 at 172:2-5, 183:25-184:1, RT 4/13 at 93:23-25 [Le] [ECF 442 at 928-40, 1053].) Later during trial, the Court distributed draft jury instructions advising that the jury  must accept as true that certain provisions were facially discriminatory. (CB Dec. Exh. 1 at 23.)  However, shortly before instructing the jury, over Ohio House's objection, the Court revised its instruction to read instead that the jury "must accept as true that Ohio House has *offered sufficient evidence to prove* that each of the following provisions of the City's group home regulations are facially discriminatory: [listing]." (RT 4/14/2022 at 28:4-20, 48:6-49:5 [ECF 442 at 1149-51, 1169-70].) Then, during closing argument the City objected when plaintiff's counsel described the regulations to have been found to be facially discriminatory by the Court, and the Court reinstructed the jury, advising that "all the Court has held" was that Ohio House had "offered sufficient evidence to prove" facial discrimination. (RT 4/14 at 102:12-17, 105:17-107:11.)

Significantly, the Court also overruled Ohio House's objections to the instruction on the City's legitimate use of zoning powers and refused its requested instructions. (ECF 412 at 4-5 [Instr. 32, 39]; ECF 423 at 36.) Ohio House asked the Court to instruct the jury that "the City's interest in preserving the character of residential neighborhoods, decreasing congestion, traffic, and noise in residential areas, and restricting the number of unrelated people who may occupy a residence, are not interests that may be used to justify facial discrimination."  (ECF 333 at 108 [Instr. 32]; ECF 333 at 140 [Obj. Instr. 39]; ECF 412 at 4 [Instr. 32].) The Court declined, instead giving a single instruction at the end of the instructions on claims

that the City "may not use proof of a legitimate, nondiscriminatory government interest to justify facial discrimination." (ECF 423 at 49.) Ohio objected that the instruction was buried at the end of the instructions and insufficient to overcome the prejudice of the Court's instruction that "[i]n considering the City's motives in this case, you may take into account whether the City used its zoning powers."[9] (ECF 333 at 138; ECF 416 at 4 [Instr. 32], at 5 [Instr. 39]; ECF 423 at 36.)

The Court's instruction that the jury should consider whether the City was using its zoning powers was prejudicial to Ohio House because it allowed the City to conflate the strict justifications for facial discrimination with the rational basis justifications typically allowed to uphold zoning regulations. In closing, the City repeatedly justified its group home regulations, including the spacing requirement, as "prevent[ing] institutionalization and protect[ing] the character of the neighborhood, (RT 4/14 at 108:21-109:6, 122:16-21), "[e]very one of those people in [Ohio House's] neighborhood deserves the protections that benefit the entire community," (id. 118:6-10), "rules to protect the community and to protect the residents in those homes," (id. 125:24-126:3), "designed to prevent neighborhoods from becoming overrun with facilities," (id. 133:1-5), "a city has . . . a lawful right to enact zoning regulations and codes to protect its community," (id. 136:8-19), the code "benefits and protects the communities," (id. 136:25-136:1), and having more than three people (the average occupancy in Costa Mesa) "undermines the residential character of the neighborhood," (id. at 122:22-123:3.) (See also CB Dec. Exh. 2 at 2, 26-27, 47-48, 53-54, 61-62 [slides].) Ohio House requested that the special verdict

---

[9]The instruction continued: "Uses of zoning powers include, but are not limited to, preserving the character of residential neighborhoods; preventing overcrowded conditions; promoting safety and well-being; decreasing congestion, traffic, and noise in residential areas; and restricting the number of unrelated persons who may occupy a residence. [¶] However, the City may not use its zoning powers in manner that restricts the housing opportunities of disabled persons." (ECF 423 at 36.)

form separately ask whether the City had proven its affirmative defense to facial discrimination.  (ECF 415-1, 418.)  The Court refused, only asking the jury whether the City had discriminated in violation of the FHA and FEHA. (RT 4/14 at 5:16-6:12; ECF 427.)  That refusal again allowed the City to conflate and lump together the justifications for facial discrimination with those unable to support its justification defense – creating the exact prejudicial situation Ohio House had warned of before trial. (ECF 254.) These errors prejudiced Ohio House and deprived it of a fair trial. If the Court does not grant Ohio House's Rule 50 motion on facial discrimination then it should order a new trial on that claim, this time expressly instructing the jury that the City's regulations are facially discriminatory and focusing the jury on the City's affirmative defense of benefit only.

### 2. Errors re interference

If the Court does not grant Ohio House's Rule 50(b) motion on interference, then it should order a new trial because of jury instruction error and an inaccurate special verdict form. Over Ohio House's objection, the Court erroneously instructed the jury that Ohio House's interference claim alleged that "[t]he City adopted certain housing regulations *with an intent to interfere with disabled persons housing opportunities*."  (ECF 417 at 1 [Obj to Court's Instruction] [emphasis added]; ECF 423 at 18 [JI]; RT 4/14 at 46:6-8 [ECF 442 at 1167].)  Ohio House also objected to the final special verdict form which asked the jury whether "Defendant City of Costa Mesa interfered *with the rights of disabled to a housing opportunity of their choice*" in violation of the FHA or FEHA. (ECF 427, Question 4 [Verdict] [emphasis added]; ECF 418 at 2 [Objection].) Ohio House emphasized that the § 3617 claim was personal to it – the City interfered with *Ohio House* because it was providing housing for persons with disabilities and requested that the verdict form be revised accordingly.  (ECF 417 at 1; ECF 418 at 2.)  Ohio House requested that the verdict form be revised to ask the jury whether "the City interfered with Ohio House in violation of [the FHA and FEHA] because Ohio House was engaged in providing

1    housing for persons with disabilities."  (ECF 418 at 2.)

2         The Court's instruction and verdict was erroneous because they made proof of

3    interference contingent on proof of an underlying discriminatory housing practice.

4    But proof of a violation of § 3617 does not require proof of a discriminatory housing

5    practice in violation of §§ 3604-3606.  *Smith v. Stechel*, 510 F.2d 1162, 1164 (9th

6    Cir.1975); *Revock v. Cowpet Bay W. Condo. Ass'n*, 853 F.3d 96, 112 (3d Cir. 2017);

7    *Hidden Vill., LLC v. City of Lakewood*, 734 F.3d 519, 528-29 (6th Cir. 2013).  All

8    that is required is that the defendant interfered with the plaintiff because of the

9    plaintiff's protected activity – the defendant need not have engaged in any other

10   discriminatory housing practices. *Hidden Vill.*, 734 F.3d at 528-29. That error played

11   into the City's version of the case. (See RT 4/13 at 155:4-16 [ECF 442 at 1115]; RT

12   4/14 at 137:22-25.) Explicitly pointing to the verdict form, the City argued in closing

13   that it had not "interfered with the rights of the disabled to a housing opportunity"

14   because the ordinance was [r]easonable and justified," and "[i]ncreased housing

15   opportunities." (Id. at 139:10-18; CB Dec. Exh. 2 at pp. 61-62, 69.)  Given the error

16   in the verdict form described above, the jury could very well have found that the

17   City's regulations were justified based on legally insufficient bases and, in turn, found

18   no interference.

19        The Court must presume prejudice where an erroneous jury instruction is given.

20   *Frost v. BNSF Ry. Co.*, 914 F.3d 1189, 1198 (9th Cir. 2019) The burden shifts to the

21   City to show that "it is more probable than not that the jury would have reached the

22   same verdict" without the error.  *Id.*  And the use of a special verdict form that does

23   not "fully and fairly present[]to the jury the issues it was called upon to decide,"

24   requires reversal and a new trial. *United States v. Real Prop. Located at 20832 Big*

25   *Rock Drive, Malibu, Cal. 90265*, 51 F.3d 1402, 1409 (9th Cir. 1995).

26                    ***3. Refusal to instruct on Ohio House's theories***

27        The Court declined to instruct the jury (or otherwise rule as a matter of law as

28   requested) on Ohio House's two claims, discussed above, that the City's reasonable

                                                    -22-

accommodation provisions were contrary to the FHA and FEHA and its refusal to make any reasonable accommodation in the 650-foot separation requirement violated its duties under those laws. (ECF 333 at 184-87, 190-93 [Instr. 48, 49]; ECF 412 at 7, ECF 416 at 7; ECF 414 at 11-12; RT 4/13 at 143:1-15.) It also denied Ohio House's request to instruct the jury that the goal of preventing clustering or promoting integration could not justify facial discrimination. (See Part I.E.-I.F above; ECF 412 at 3-4, ECF 416 at 4.) The Court also refused to instruct that the City cannot have a legitimate governmental interest in violating state law, relevant to the City's use of the more restrictive "overcrowding" definition for group homes, (ECF 412 at 5, ECF 416 at 5-6). It also collapsed the specific reference to facial discrimination in overcrowding into generic "restrictions." (CB Dec. Exh. 1 at 23; ECF 423 at 24.)

### 4. Refusal to instruct on preemption

As discussed below, the Court also erred when it denied Ohio House's request to instruct the jury that the City's group home regulation may not conflict with federal or state law pursuant to 42 U.S.C. § 3615 and Government Code § 12955.6. (See ECF 333 at 196 [Plaintiff's Proposed Instruction 50]; ECF 412 at 7; ECF 416 at 7.) The jury needed to be made aware that other authorities besides the City governed the legality of its zoning regulations.

### B. The Court erred in admitting inflammatory testimony.

Brandon Stump, founder of The Ohio House, was unavailable for trial, and the City presented his testimony via videotaped deposition. (RT 4/12 at 115:11- 116:9; RT 4/13 at 12:35-13:7.) The Court overruled Ohio House's objections to Stump's response to the question "why do you think it was discriminatory for someone at the city council to say that Ohio House was ruining the character of the neighborhood?":

> [W]hen I heard that The Ohio House was ruining the character of the neighborhood, what I heard was: **You got a bunch of niggers, spics and Jews living in that house, and they're not fucking welcome here.** [¶] What I heard was that: You guys need to go live in a cage in a commercially-zoned

1    area. You're not even allowed here. [¶] What I heard was: We don't fucking

2    care about you.

3  (ECF 413-1 at 2, Depo. at 138:13, 138:15-139:3 [emphasis added]; ECF 390 at 5

4  [FRE 401-403, 404, & 608 objs.). Ohio House renewed its objections before the

5  deposition video was played, stating that "the language he uses is inappropriate and

6  inflammatory, and I think it reflects unfairly on The Ohio House" and "it certainly

7  doesn't add any probative value." Rather, "it certainly reflects him being a gentleman

8  who . . . I think spoke inappropriately  But that's not the issue  here." (RT 4/12 at

9  107:16-108:21.)  The Court agreed that it was "not the issue," but that "the jury can

10  certainly consider that passage in terms of his credibility, his bias, and so on. I believe

11  it comes in, warts and all."  (Id.)  Before the video, the Court warned the jury that

12  "you may hear some strong language in the course of this."(Id. at 115:11-16.)

13    During closing argument, the City emphasized Stump's testimony in a manner

14  calculated to highlight its inflammatory and prejudicial nature. City counsel displayed

15  a slide containing the excerpt from the Stump deposition quoted above, with the

16  following in bold:  **You got a bunch of [n-word], spics and Jews living in that**

17  **house, and they're not [f-ing] welcome here.**  (CB Dec. Exh. 2, pp. 33-34.) Counsel

18  for the City argued that Stumps testimony was "awful," "disgusting," and

19  "despicable," and "speaks to" the suggestion that "sober-living home operators

20  should not be subject to regulation." (RT 4/14 at 126:10-16.)

21    Stump's testimony and the City's emphasis on it had an obvious effect on the

22  jury.  Shortly after the jury retired (2:38 p.m.), they sent a note (3:33 p.m.):

23    Please clarify – Brandon Stump testified he feels the denial or City's request

24    to prevent institutionalized neighborhood and preserve character is because

25    City has racially motivated discrimination. This changes the ground for which

26    the case was brought. **Threat by Stump** is this is because they're racist.

27    Clarify or remove evidence.  Material change in grounds for lawsuit.

28  (RT 4/14 at 163:2-10; ECF 429 [emphasis added].)  After conferring and reaching

-24-

1   agreement with counsel, the Court responded with a note to the jury (4:03p.m.)

2   advising it that there was no legal claim that the City's action were racially motivated

3   or any claim based on Stump's personal opinions. (RT 4/14 at 163:11-167:8; ECF

4   430.)  The jury stopped deliberating at 4:40 p.m. (RT 424.)  They reconvened at 9:30

5   a.m. on August 18 and reached a verdict little over one hour later.  (ECF 424, 431.)

6       Evidence that Brandon Stump used the slurs "n-----s, spics and Jews" to

7   describe his feelings has no relevance to any triable issue and that evidence was

8   highly inflammatory. Courts recognize that evidence of racial slurs and the "N-word

9   in particular,  may provoke strong emotions in jurors.  *See Haibo Jiang v. Town of*

10  *Tonawanda*, No. 15-CV-898-A, 2018 WL 2440122, at *3 (W.D.N.Y. May 31, 2018)

11  (the court "is conscious of the fact that some jurors may be inflamed by racial

12  epithets"); *Harang v. Schwartz*, No. CV-13-0058, 2014 WL 12724985, at *7 (E.D.

13  La. June 4, 2014) (court "is cognizant that for many individuals, hearing the N-word

14  results in a strong, personal reaction"). The word is "perhaps the most offensive and

15  inflammatory racial slur in English." *Swinton v. Potomac Corp.*, 270 F.3d 794, 817

16  (9th Cir. 2001). The term "spic" is also highly offensive, *Cerros v. Steel Techs., Inc.*,

17  398 F.3d 944, 949-50 (7th Cir. 2005), and references to a group as "Jews" is usually

18  a slur. *United States v. Heller*, 785 F.2d 1524, 1526 (11th Cir. 1986).

19      Evidence of Brandon Stump's use of racial slurs was devoid of any probative

20  value. Stump was not on trial here and his understanding of the claims and theories

21  underlying Ohio House's lawsuit is irrelevant.  *Islam v. City of Bridgeton*, 804 F.

22  Supp. 2d 190, 198 n.3 (D.N.J. 2011) ("Plaintiff's subjective awareness of how her

23  First Amendment rights were violated is not an element of her claim."); *see also*

24  *Bostock v. Clayton Cnty.*, 140 S. Ct. at 1745 (employee's "conversational conventions

25  [as to why she was fired] do not control Title VII's legal analysis"). His role as

26  founder and owner of the Wilson property tied Stump to The Ohio House and his use

27  of those slurs had no relevance but was highly prejudicial.  (CB Dec. Exh. 2 at 33.)

28      When irrelevant and prejudicial evidence of a party's use of racial slurs is

-25-

admitted, reversal for a new trial is appropriate even in civil cases.  *See*, *e.g.*, *MCI Exp., Inc. v. Ford Motor Co.*, 832 So. 2d 795, 797, 800 (Fla. Dist. Ct. App. 2002) (reversing defense verdict where audiotape played in which plaintiff's CEO referred to company drivers as "Goddamn Cubans"; such evidence "was highly prejudicial and could only inflame the jurors against [the plaintiff]"); *Green v. New Jersey Mfrs. Ins. Co.*, 160 N.J. 480, 488-90, 503 (N.J. 1999) ("evidence demonstrating the racial bias or bigotry of a testifying party, *regardless* of the racial composition of the jurors, will almost always have the potential to [dramatically] prejudice the witness").

The utter lack of probative value of Stump's testimony and the short seven-minute length of the excerpt played,  raises the strong suspicion that the testimony was played only so that the jury could hear his reference to racial slurs.  (RT 4/12 at 115:21-116:9; ECF 413-1.)  Defense counsel's closing argument emphasized that inflammatory evidence, inviting the jury to conclude that Stump's statement established the need for group home regulations. (RT 4/14 at 126:10-16.) Unfair prejudice occurs when the evidence has "'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *United States v. Skillman*, 922 F.2d 1370, 1374 (9th Cir. 1990) (quoting Fed. R. Evid. 403 adv. comm. note).  It is evidence, like the use of racial slurs here, "which appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or otherwise may cause a jury to base its decision on something other than the established propositions in the case." *Id.* (internal quotations and citation omitted).

Erroneously admitting that evidence affected Ohio House's substantial rights, requiring reversal of the judgment and grant of a new trial. The jury was obviously disturbed by Stump's use of the words, describing his language as a "threat," and sending a note to the Court  less than an hour after retiring to deliberate.  (RT 4/14 at 163:2-10; ECF 429.)  Prior to trial, the Court described this case as presenting "a complex factual dispute," (ECF 347 at 13; ECF 245 at 23), and the applicable law as "complex and detailed." (ECF 337).  The jury's verdict, however, was reached in just

several hours, at least one of which was devoted to Stump's testimony based on the jury's note to the Court.  Ohio House has established the need for a new trial.

## C. The Court erred in excluding relevant evidence

### 1. *HCD and HUD/DOJ documents*

The Court prohibited Ohio House from adducing evidence that the California HCD had advised the City of Encinitas that its group home regulations – *modeled on the City of Costa Mesa's group home regulations* – violated FEHA because they discriminated on the basis of disability.  (ECF 347 at 9-10; ECF 386 at 26 [offer of proof]; RT 4/8 at 7:11-17 [court allowing offer of proof to be filed].)  The Court also refused Ohio House's evidence regarding the HUD/DOJ Joint Statement on local land use laws and the FHA. (ECF 386 at 5 [offer of proof].)  These statements by the State of California and United States regarding application of the FHA, FEHA, and Government Code § 65008 to the facts of this case are highly relevant.  Excluding them was prejudicial to Ohio House because, as a result of their exclusion, the only government agency opining on the legality of the City's regulations was the City itself. Ohio House had to try to convince the jury that government was acting unlawfully, while the City was able to prevent the jury from hearing from the opinions of the state and federal governments on what the City was doing.

The terms of Encinitas's ordinance are based on Costa Mesa's ordinance. The HCD letter to the City of Encinitas advised that "HCD finds that the City's [group home] ordinance is in violation of statutory prohibitions on discrimination." (ECF 386 at p. 26 of 35.)  HCD instructed the City of Encinitas to "take immediate steps to repeal" its ordinance.  (ECF 386 at 35.) The HUD/DOJ statement advised that it violates the FHA to exclude or limit group homes based on the specific type of disability, (ECF 386 at 14 of 35), to put occupancy limitations on group homes not put on other homes, (id.), and to impose supervision requirements as a condition for a group home to operate, (id. at 17). The Court also prohibited Ohio House from presenting testimony establishing that § 65008 constrained the City's zoning power

1    by prohibiting discriminating in zoning.  (RT 4/6 at 22:20-24, 23:10-19, 26:8-15.)

2         All of this evidence was relevant because City staff had testified that they were

3    aware of those requirements.  (See ECF 281-2, 281-3, 281-4.)  As to § 65008, that the

4    City must not discriminate in zoning was a part of each staff report. (See RT 4/5 at

5    24:1-26:21 [ECF 442 at 68-70], Tr. Exh. 182 at 4 [ECF 443-3]; Tr. Exh. 720c at 4,

6    720e at 3 [filed herewith at CB Dec. Exh.9].)  That awareness was highly relevant to

7    show that the City was on notice that its regulations were discriminatory and did *not*

8    benefit persons with disabilities. The City, however, never assessed its group home

9    regulations in light of the HUD/DOJ Joint Statement. (ECF 281-4.) And the City's

10   witness Ms. Le testified in her deposition that she believed she had seen the HCD

11   letter to the City of Encinitas and discussed it with the Chairman of the City's

12   Planning Commission.  (ECF 281-5.) The City relied on the Joint Statement it its own

13   webpage on group homes. (Tr. Exh. 115 at CityWeb 32 [ECF 444-1].)

14        Ohio House was prejudiced by the exclusion of this evidence because it

15   allowed the City to claim that its regulations were perfectly legal and justified.  (See

16   RT 4/14 at 108:21-109:6, 138:1, 118:3-10, 122:16-17, 133:10-13, 137:9-17, 138:1

17   [ECF 442 at 1182-1220].) As set forth above, the City's witnesses also had testified

18   as to no discrimination or discriminatory intent.  The HCD letter and HUD/DOJ Joint

19   Statement would have contradicted the City's assertions.  The Court itself

20   acknowledged the significance of the evidence, noting the "weight that a jury is likely

21   to give the opinion of a state or federal agency." (ECF 347 at 10.) The Court's ruling

22   deprived Ohio House of the ability to show that the City was well aware of the

23   opinions of state and federal agencies but had proceeded to enforce its regulations

24   regardless. This evidence, along with the preemption instruction requested by Ohio

25   House, would have provided the basis for it to argue that federal and state law

26   trumped the City's ordinances.

27        **2. Other evidence**

28        The Court denied as cumulative Ohio House's attempt to admit a set of City

-28-

Planning Commission staff reports that repeatedly stated that words to effect that "group homes serving disabled persons as defined by state and federal law are not considered to be boardinghouses." (RT 4/13 at 75:11-79:7; CB Dec. Exh. 3 excerpts from Exh. 720d, 720f-720h, 720j-720p.)  Ohio House also had to redact significant portions of the Orange County Analysis of Impediments in which the City advised HUD that it did not "mischaracterize" group homes as "boardinghouses." (Tr. Exh. 268 [ECF 443-3]; RT 4/8 at 163:164:5 [Curtis]; RT 4/12 at 196:7-200:6; RT 4/13 at 102:9-24 [Le]; compare unredacted Exh. 268, CB Dec. Exh. 4.) This evidence was relevant to counter the City's claims that group homes were boarding houses. The Court also prohibited Ohio House from impeaching Nancy Clark, who testified that she had never seen any indication of the City's intent to discriminate, with Clark's own letter to the City after it denied her CUP application in 1995 in which she raised concerns regarding disability discrimination.  (RT 4/12 at 65:16-68:6; compare CB Dec. Exh. 5 with Tr. Exh. 389 [ECF 444-1].)

The Court also excluded Ohio House's evidence of the need for sober living. (RT 4/8 at 11:3-5, 171:1-181:2; RT 4/13 at 6:13-7:24, 11:3-5; CB Dec. Exh. 6). That evidence was offered to counter the City's argument that group home operators were greedy and show that there was a need for their services in Orange County.  (RT 4/13 at 7:11-15.) Ohio House sought to admit summary exhibit 202c (erroneously referred to as 282c in the transcript) reflecting City code enforcement citations from 2016 to 2019 which showed that in 2018 citations issued to group homes in the MFR zones for violating the group home regulations constituted 38% of all citations.  In 2019 they represented 20% of all citations.  (CB Dec. Exh. 7; RT 4/8 at 175:10-177:10.) Ohio House also sought to admit summary exhibit 284c which reflected that a tiny portion of the City's residential housing were actually group homes. (CB Dec. Exh. 8; RT 4/8 at 177:12-180:2.) This evidence, together with summary exhibit 202c, showed the disproportionate enforcement against group homes compared to their actual numbers in the City, countering its "benefit" claim.

## D.  The jury's verdict is against the weight of evidence

When determining whether to grant a new trial, the Court may reweigh the evidence and make credibility determinations and is not required to draw all inferences in favor of the verdict. *Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd*, 762 F.3d 829, 845 (9th Cir. 2014).  Even if the Court concludes that Ohio House was not entitled to judgment as a matter of law on the City's benefit defense, it should grant a new trial because the verdict is against the weight of the evidence which did not support the conclusion that group homes were boardinghouses and that group homes were subject to preferential treatment.[10] (See also Part I.B.2 above .)  Indeed, that evidence was so one-sided that the Court refused to admit more staff reports repeating that same statement. (See RT 4/13 at 75:11-78:18 [ECF 442 at 1035-38.)

Dated:  October 4, 2022.    Respectfully submitted,

BRANCART & BRANCART

*/s/ Elizabeth Brancart*
Brancart & Brancart

Attorneys for Plaintiff The Ohio House LLC

---

[10]Unlike the self-serving testimony offered by the City from the only witness *not* at the City during the relevant events, (RT 4/13 at 33:24-35:12, 38:8-43:6 [Le]), every witness involved in or supervising the actual handling of group home CUP applications on behalf of the City testified that there was no connection between group homes and boardinghouses. (RT 4/8 at 93:14-23 [Curtis]; Tr. Exh. 243, p. 1 [ECF 443-3].) Virtually every City  Planning Commission and City Council Resolution on group home CUP applications (as well as staff reports) contained the following statement: "Group homes serving disabled persons as defined by state and federal law are not considered to be boardinghouses."  (See, e.g., [ECF 443-3] Tr. Exh. 112 at Sum 267, 280, 294, 307, 322, 344, 368, 372, 386, 400, 414, 436, 447, 460; Tr. Exh. 720c at 9, 720e at 8 [filed herewith. CB Dec. Exh. 9].)  Nor was there any indication of that purported connection in the City's office communications, application forms, or website.  (RT 4/12 at 13:12-20:25; Tr. Exh. 110, 114, 115 [ECF 443-1, 441-6]; RT 4/12 at 190:1-192:2; [ECF 442 at 387:13-389:3]; See RT 4/6 at 161:18-163:3; Exh. 198 [ECF 444-1]; RT 4/12 at 190:1-192:2; RT 4/13 at 44:22-24 ; Tr. Exh. 268 [ECF 443-3, AI statement]; RT 4/6 at 144:20-145:1.)

**CERTIFICATE OF SERVICE**

Pursuant to Rule 5 of the Federal Rules of Civil Procedure, on October 4, 2022, I served by the ECF system a copy of the attached document – **PLAINTIFF THE OHIO HOUSE LLC'S NOTICE OF RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW AND FOR NEW TRIAL; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF; DECLARATION OF CHRISTOPHER BRANCART** – on the following attorneys:

Samantha E. Dorey
Seymour B Everett, III
Christopher D. Lee
Everett Dorey LLP
18300 Von Karman Avenue Suite 900
Irvine, CA 92612
Fax: (949) 377-3110
sdorey@everettdorey.com
severett@everettdorey.com
clee@everettdorey.com

Kimberly Hall Barlow
Bruce Lindsay
Monica Choi-Arredondo
Jones Mayer
3777 North Harbor Boulevard
Fullerton, California 92835
Fax: (714) 446-1448
khb@jones-mayer.com
bal@jones-mayer.com
mca@jones-mayer.com

*/s/ Elizabeth Brancart*